# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### NEW ALBANY DIVISION

DELMAR H. LEATHERMON, MARGARET L. ) 
LEATHERMON, RHONDA WILEY, JOHN J. ) 
JAYNES, TERRY ROWLETT, AND KAREN S. ) 
ROWLETT, on behalf of themselves and all others ) 
similarly situated, )
                                    )
              PLAINTIFFS )
                                    )

v. )          **Civil Action No.**
                                    )          **4:07-CV-137-SEB-WGH**

GRANDVIEW MEMORIAL GARDENS, INC., ) 
BENNY GARLAND, JIMMY W. SIMPSON, ) 
CARRIAGE FUNERAL SERVICES OF INDIANA, ) 
INC., CARRIAGE CEMETERY SERVICES, INC., A ) 
WHOLLY OWNED SUBSIDIARY OF CARRIAGE ) 
SERVICES, INC., CARRIAGE SERVICES, INC., ) 
JAMES R. HOLT, MADISON FUNERAL SERVICE, ) 
INC., AND GRANDVIEW MEMORIAL GARDENS, ) 
LLC, )
                                      )
             DEFENDANTS

## PLAINTIFFS' RESPONSE TO
## MOTION TO DISQUALIFY PLAINTIFFS' COUNSEL
## FILED BY GRANDVIEW MEMORIAL GARDENS, LLC

### INTRODUCTION

       This case involves claims asserted by the named Plaintiffs, as representatives of a putative

class of hundreds, and perhaps thousands, of individuals who have been damaged as the result of

an inadequate or non-existent drainage system at Grandview Memorial Gardens Cemetery,

Madison, Indiana (the "Cemetery"). These problems caused lawn crypts to become flooded with

water and casket and bodily remains to become water soaked and to deteriorate. Plaintiffs assert,

*inter alia*, claims based upon negligence, breach of contract and Indiana Consumer Protection

Law theories. A Motion to Amend and Supplement the Complaint is pending. Written discovery

and numerous depositions have been taken, limited by Order to class certification and remand

issues.  Now, some twenty months after the action was filed, and without any attempt to explain or excuse its delay, Defendant Grandview Memorial Gardens, LLC ("Grandview LLC"), has moved to disqualify Plaintiffs' counsel based solely on facts admittedly known by Grandview LLC before the case was filed.  Because Grandview LLC's motion is without any substantive factual basis and, in any event, any perceived conflict of interest was long ago waived, Plaintiffs urge that the Motion be denied.

That such a serious motion would be filed without the careful investigation and analysis that such consequential matters demand is regrettable.  A reasonable investigation and analysis would have revealed that no conflict of interest exists because no attorney-client privilege could have developed between Grandview LLC and either J. Anthony Goebel or M. Stephen Pitt, especially where Grandview LLC's principal member, Keith Mefford, spoke so candidly with the public and the press for months about the problems at Grandview Cemetery and gave Cemetery records to a public group he helped found.

But the lack of care with which this motion has been prepared is particularly egregious when the "client" -- a and its lawyers -- admittedly knew of the alleged conflict since before the lawsuit was filed but sat on the information until counsel made the considered decision to employ "thermo-nuclear war" if Plaintiffs declined to dismiss their client from this lawsuit.  Under these circumstances, the Court must act to protect the Plaintiffs and the judicial system from such misconduct.  "[M]otions to disqualify counsel should be viewed with extreme caution since they can be misused as techniques of harassment." *Chemical Waste Management, Inc. v. Sims*, 875 F.Supp. 501, 503-504 (N.D. Ill. 1995), citing, *Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424, 436 (1985) ("We share the Court of Appeals' concern about 'tactical use of disqualification

motions' to harass opposing counsel"). That concern presents itself in spades with the motion before the Court. The Motion to Disqualify should be denied.

## STATEMENT OF RELEVANT FACTS

This litigation was filed on August 17, 2007. In order to appreciate the lack of merit of the Motion to Disqualify, it is helpful to understand the sequence of events which transpired for over a year prior to this suit being commenced. Those indisputable events demonstrate that Grandview LLC, through Mefford, had publicly disclosed every conceivable "confidential" fact regarding the inadequate or non-existent lawn crypt drainage system long before any lawyer who is a subject of the Motion to Disqualify became involved. They further demonstrate that neither Grandview LLC nor Mefford reasonably could have believed that any of those lawyers were representing either of them.

Grandview LLC purchased the Cemetery from Madison Funeral Services, Inc. in 2005 [Affidavit of Keith Mefford, ¶4]. Thereafter, on June 14, 2006, Madison Funeral Services, Inc. sued Grandview LLC asserting a breach of the purchase agreement by virtue of Grandview LLC's failure to make installment payments of the purchase price. Grandview LLC did not engage any of the lawyers who are the subject of this Motion to Disqualify to represent it in the Madison Funeral Services, Inc. litigation. Instead, Grandview LLC engaged Wilmer Goering of Alcorn, Goering & Sage, LLC to represent it in that lawsuit. Through Goering, five days later Grandview LLC filed it own lawsuit against Madison Funeral Services, Inc. on June 19, 2006.[1] Grandview LLC's lawsuit contended that Madison Funeral Services, Inc. had breached the purchase

---

[1] Additional Grandview LLC attorneys, Phillip A. Whistler & Scott D. Matthews of the Ice Miller LLP firm in Indianapolis withdrew as counsel by order entered August 20, 2007.

agreement in several respects, thus entitling Grandview LLC to damages [Affidavit of Terry Rowlett (Exh. 1), ¶8, Exh. C].

Grandview LLC wasted little time in initiating a public relations campaign seeking to portray itself as the "whistleblower."  Mefford invited the public and press to a meeting at the Cemetery, July 29, 2006.  At that meeting, for two hours Mefford explained in detail the problems facing the Cemetery.  He explained to a crowd of about 65 people, that "graves are full of water because proper drainage was not installed, beginning several ownerships ago." ["Cemetery Owner Addresses Lawsuits, Flooding Problems," *The Madison Courier*, July 31, 2006, attached as Exhibit C to the Rowlett Affidavit].  The July 31, 2006 *Madison Courier* article reported that: "The group got some education on cemetery terminology . . . ."  According to the article, Mefford explained:

> A vault is made of concrete and is built in the grave, and then the coffin is lowered into it before it is sealed shut.  A ground crypt is less expensive, is not watertight and has holes in it for drainage.  Rows and rows of them were installed at one time, Mefford said, so that when a burial takes place, all the cemetery has to do is dig down two feet, open it and lower the casket into it.
>
> The ground vault areas are supposed to have a layer of gravel on the bottom, drain pipes and another layer of gravel, Mefford said, but he said that was not done at Grandview.

*Id*. at 1-2.  At this and other public meetings, Mefford discussed other issues that plagued the Cemetery.  These included missing trust funds, state investigations and arson at the Cemetery office [*See* Exh's. B, C, D to Rowlett Aff.].

At the July 29, 2006 public meeting, Mefford urged the formation of a "community advisory board for Grandview" [*Madison Courier*, July 31, 2006, Rowlett Aff., Exh. C].  Thereafter, an organization known as Volunteers for Grandview Committee, Inc. ("Volunteer Committee") was formed [Rowlett Aff., ¶1].  Significantly, in the Fall of 2006, Mefford provided the Volunteer Committee access to many Grandview Cemetery records he said might be helpful in

any lawsuit on behalf of the people who purchased lawn crypts at Grandview [Rowlett Aff. ¶ 9]. These voluminous records had been stored at the office of the Cemetery. They included records going back to the founding of the Cemetery in the late 1960's. Mefford permitted the Volunteer Committee to take the records from the office of the Cemetery to be stored at the funeral home operated by Mr. Rodney Nay [*Id.*; J. Anthony Goebel Aff. (Exh. 2), ¶8].

It is important to recognize that, at this point in time, no lawyer who is the subject of the Motion to Disqualify had become even remotely involved in any matters concerning the Cemetery. Indeed, these lawyers had not even contacted or discussed the Cemetery with any potential plaintiff or Mefford. Instead, it would still be many months later before that would occur. Nevertheless, Mefford, on behalf of Grandview LLC, had already given the public and press an "education" on the problems at Grandview in a public meeting. Furthermore, he had also permitted the Volunteer Committee to take voluminous Cemetery records from the office of the Cemetery to Nay's funeral home. Of course, the Volunteer Committee was not only composed of members of the public, it consisted of persons who had potential claims against Grandview LLC and prior owners of the cemetery [*See* Rowlett Aff., ¶5]. In these circumstances, there cannot be a legitimate claim that any "confidential" information remained concerning the water and drainage problems at the Cemetery. In short, at least since the commencement of the Madison Funeral Services, Inc./Grandview LLC state court litigation in June, 2006, Mefford and Grandview LLC had decided to "go public" not only with everything they knew about the drainage problems, but also many of the business records of Grandview LLC that dated well back into the 1960's and 1970's.

Months after these events, on January 22, 2007, Goebel, one of counsel for the Plaintiffs who is a subject of the Motion to Disqualify, discussed with attorney John C. Eckert of the Eckert

Law Firm in Madison, Indiana, the sharing of office space at Eckert's office in Madison, Goebel's hometown. Goebel, who was contemplating re-entering into the practice of law after over six years as a church pastor, and Eckert decided to explore the possibility of becoming affiliated as "of counsel" to each other's firm. After research about the "of counsel" designation, an arrangement was completed in February 2007. Prior to that date, Goebel had no affiliation with the Eckert Law Firm or with any client of that firm. After that date, Eckert and Goebel referred new client matters to each other and kept all previous or existing client information confidential to those previous or existing clients. Eckert and Goebel explained to all referred clients that they were not associated as a partnership, that they only shared office space at each other's firms, and that each attorney was responsible for his own cases or matters. Each client was told that Goebel's main office was in Georgetown and that Eckert's main office was in Madison. Eckert and Goebel each pay the compensation of his own employees, each attorney maintains his client files separately at his own main law office location, and otherwise operates his law practice separately. Goebel did not have a key to Eckert's offices and Eckert's office computers are password protected so that Goebel does not have access to them.[Goebel Aff., ¶¶4, 7, 8, 12].

During the week of March 12, 2007, Goebel received a phone call from Eckert in which Eckert asked if Goebel could meet with the Volunteer Committee that had been formed due to problems that had been discovered at Grandview Memorial Gardens. During the same week Goebel received a call from a member of the Volunteer Committee, who had made arrangements for Goebel to meet the Committee's Executive Board at the Morgan & Nay Funeral Centre in Madison on Saturday, March 17, 2007. At sometime prior to the meeting, Eckert advised Goebel that he had represented the then-current owner and operator of the Cemetery, Grandview LLC, and/or its principal member, Mefford. Although Goebel did not believe there to be a conflict, he

nevertheless decided that he would seek a waiver of any potential conflict of interest from the Volunteer Committee if Goebel was retained to act as its attorney.  Goebel met with the Executive Committee of the Volunteer Committee on March 17, 2007 and was retained as the Committee's attorney [Goebel Aff., ¶¶5-6; Rowlett Aff., ¶3-5, and Exh. A].

At the meeting, Goebel explained his professional connection with Eckert and, out of an abundance of caution, sought a waiver of any potential conflict of interest that could be perceived to result from that relationship [Goebel Aff., ¶6].  As indicated by the minutes of the meeting, the Committee waived any perceived conflict [Rowlett Aff., ¶5, Exh. A].  At that point, Goebel was retained by the Volunteer Committee to represent it in connection with the problems at Grandview Cemetery and to evaluate the legal remedies that might exist because of water problems at the Cemetery.  Other issues involving deficiencies in the pre-need trust accounts for the Cemetery were being handled by Richard Shevitz and Vess Miller at the Indianapolis law firm of Cohen & Malad, LLP [Goebel Aff., ¶6].

Goebel was also invited by the Volunteer Committee to be present at Grandview Cemetery on March 21, 2007, when the disinterment of the human remains of several individuals was to take place.  Some members of the Volunteer Committee with whom Goebel had met the previous Saturday were present along with many others from the community.  He was able to observe firsthand the water problems at the Cemetery, including the condition of the caskets, the failures of the lawn crypt system and the effects on the human remains of loved ones.  Grandview LLC's Keith Mefford also was present and was pointed out to Goebel, but Goebel did not meet or speak to Mefford that day [Goebel Aff., ¶7].

Later that same day, Goebel met members of the Volunteer Committee at Morgan & Nay Funeral Centre to review the numerous boxes of historic Cemetery records that Mefford had

provided the Volunteer Committee in the Fall of 2006, before Goebel re-entered the practice of law. While at Morgan & Nay, Goebel made arrangements to have the Cemetery records delivered to the Eckert Law Firm later in the day. Some of those now public documents were stored in the office set aside for Goebel's exclusive use and some were stored in a locked storage area in the basement of the Eckert Law Firm [Goebel Aff., ¶7].

Goebel began reviewing the Cemetery records and also arranged meetings with several people who had knowledge of the situation at Grandview. The Cemetery records were voluminous, consisting of thousands of pages of documents, and contained information about the Cemetery from the late 1960's through at least the late 1990's, with a few records dated after 2000, but did not appear to include any records related to the operation of the Cemetery by Grandview LLC or to the current drainage and watery grave problems at the Cemetery from which this action arises [Goebel Aff., ¶7].

Early on, Goebel believed that, as a solo practitioner, he would need the assistance of other attorneys to help with the potential lawsuit. He contacted M. Stephen Pitt, a partner at his former law firm, Wyatt, Tarrant & Combs, LLP ("the Wyatt firm"), and currently one of Plaintiffs' counsel in this action, to see if he and his firm had any interest in getting involved. Goebel knew that Pitt and others with whom he had worked over the years at the Wyatt firm had been involved in class action lawsuits and that a large firm like the Wyatt firm would have the resources necessary to assist in handling litigation of this magnitude [Goebel Aff., ¶8]. Pitt's first exposure to this case came during a phone call from Goebel on April 4, 2007.

Goebel told Pitt about a meeting with Volunteer Committee representatives scheduled to occur April 13, 2007 at the Eckert law firm in Madison. Goebel and Pitt were to meet with Terry Rowlett, the President of the Volunteer Committee, and Nay. Mefford had previously learned of

the meeting and said he wanted to be present to answer any questions the attorneys might have about the water and drainage problems at the cemetery [Goebel Aff., ¶10].

On the drive from Louisville to Madison, Goebel and Pitt discussed I.C. 23-14-52-2, which Pitt had reviewed for Goebel by phone on April 5, 2007.  That statute appeared to them to render any purchaser of an Indiana cemetery liable for obligations of previous cemetery owners.  For that reason, Goebel and Pitt decided that they should begin any meeting with Mefford by discussing that statute and the probability that Grandview LLC would have to be named as a defendant in any civil action filed over the water and drainage issues present at the Cemetery [Goebel Aff., ¶10; Pitt Aff., ¶7; Rowlette Aff., ¶7].

When they arrived at Eckert's law office on April 13, 2007, Goebel and Pitt met briefly with Eckert.  Eckert then introduced Goebel and Pitt to Mefford and Pitt to Rowlett and Nay.  Goebel introduced himself to Mefford as an attorney who was "of counsel" to the Eckert Law Firm.[2]  Goebel explained that he and Eckert shared office space but that they were not partners, the same explanation Mr. Goebel had given during his first meeting with the Volunteer Committee [Goebel Aff., ¶11; Pitt Aff., ¶6].  Eckert left the room after these introductions.

After small talk, Goebel mentioned and read the statute to Mefford, explaining to him that Grandview, LLC would likely need to be made a defendant in any action that would be filed, and gave him the opportunity to leave the meeting.  Mefford stated that he understood that Grandview LLC might need to be made a defendant.  He also said that he had voluntarily made public on several occasions negative facts pertaining to Grandview Cemetery, including issues

---

[2] In his deposition, Mefford testified he was aware at that time that Eckert and Goebel were not partners and that "Mr. Goebel was not a part of that Eckert law firm at that time" [Deposition of Keith Mefford, p. 189].

with the funding of trusts and the water and drainage issues.  Mefford indicated that he wanted to see those persons who had been damaged as a result of doing business with the Cemetery made whole [Rowlett Aff., ¶7; Goebel Aff., ¶11; Pitt Aff. ¶8].

Goebel and Pitt told Mefford that if he did not want to meet with them because his company would probably be named in the lawsuit, that they would understand.  Both Mefford and Nay asked if there was any way to avoid bringing Grandview LLC into the lawsuit.  Rowlett also commented that the citizens group did not want to sue Mefford's company unless it was necessary.  Mefford responded that he hoped his company would not have to be sued but that if it was necessary, he understood.  Mefford stayed in the meeting and stated that he would do whatever it took to see that the people got what they paid for at Grandview [Rowlett Aff., ¶¶7-8; Goebel Aff., ¶11; Pitt Aff. ¶8].

Thereafter, Rowlett, Nay and Mefford described for Goebel and Pitt in general terms the issues surrounding the Grandview pre-need trust problems (which were being handled by Cohen & Malad, LLP) and problems relating to drainage problems and water-damaged caskets and bodily remains at Grandview.  These facts were already known to Nay and Rowlett as the result of previous conversations they had had with Mefford.  They were also generally known to the public because they had been discussed by Mefford in public meetings and reported in the press.  Rowlett, Mefford and Nay also took time attempting to identify the previous owners and operators of Grandview and to place them in the proper timeframes [Rowlett Aff., ¶¶7-8; Goebel Aff., ¶11; Pitt Aff., ¶12].

Near the end of the April 13, 2007 meeting, Goebel and Pitt asked Mefford whether Grandview LLC was insured.  He said "yes" and made a call to his mother or mother-in-law and asked her to bring Grandview, LLC's insurance policy to Eckert's office.  Later in the afternoon,

after the meeting had broken up, an original insurance policy number CPP9615413 with the named insured "Grandview Memorial Gardens LLC," written by Hastings Mutual Insurance Company through Gardner Insurance Agency, Inc., Madison, Indiana, and effective July 5, 2005, was delivered to Eckert's reception area.  Pitt took the insurance policy back with him to his office, had it photocopied and mailed the policy back to Mr. Mefford on the following Monday, April 16, 2007 [Goebel Aff., ¶11; Pitt Aff., ¶10 and Exh. A, thereto].

A week later, on April 20, 2007, a class action lawsuit was filed in state court in Indianapolis by the Cohen & Malad firm on behalf of Cecilia Means, and others similarly situated, against Grandview LLC and other defendants.  The suit dealt with the pre-need trust issues Mefford had publicly divulged and discussed beginning in the summer of 2006.  According to a news report of April 24, 2007 about the filing of the *Means* litigation:

> Keith Mefford, president of the current owner, Grandview Memorial Gardens, LLC, said he "knew and hoped the case would come about."  He gave lawyers access to the cemetery's books, and he said he understands that his company has to be named as the current owner.

["Lawsuit Filed Over Cemetery's Handling Of Burial Money," AP Alert – Indiana, April 24, 2007 Rowlett Aff., ¶8 and Exh. B].  Accordingly, contrary to the assertions now made in his Affidavit that he was "shocked and surprised" at being sued, at the time the *Means* litigation was filed, Mefford told the press that he "understood" that Grandview LLC had to be a defendant, that he had given access to Cemetery records to the lawyers who filed the *Means* suit (Cohen & Malad), and that he "knew and hoped" the suit would be filed.  In particular, Paragraph 27 of Mefford's Affidavit simply cannot be squared with this contemporaneous press report.  Speaking to the *Means* litigation, Mefford asserts in Paragraph 27 of his Affidavit that if he had been told that the Cohen & Malad attorneys

> . . . were not there to help me and that the information I was being asked to provide could or would ultimately be used against me or the LLC, I would not have agreed to such meeting, would not have told them my story, would not have educated them, and would not have provided them with unrestricted access to cemetery records.

[Mefford Affidavit, ¶27]. Yet, only days after *Means* was filed, he publicly stated he had "hoped the case would come about" and -- in his role as the whistleblower -- that he had cooperated with the attorneys to that end.

With the *Means* case already pending for four months, Goebel finished his preliminary investigation and prepared and filed the Complaint in this case on August 17, 2007, without substantive input from Eckert [Goebel Aff., ¶12]. Mefford then called a public meeting for August 19, 2007 before even being served with the Complaint. According to press reports of that meeting

> Mefford reiterated that problems at Grandview that are the subject of lawsuits happened before he took over, and that his company, Grandview Memorial Gardens LLC is named in the lawsuits only because as the owner it inherited liabilities from previous owners.

["Mefford Frustrated Over Grandview Problems," *Madison Courier*, August 20, 2007, Rowlett Aff., ¶8, Exh. D]. Again, this contemporaneous press account conflicts with Mefford's Affidavit. For example, Paragraph 36 of the Mefford Affidavit inexplicably states: "I never imagined that my company would ever become a defendant in these lawsuits. I was shocked and surprised when Grandview Memorial Garden LLC was made a defendant in *Means* and then in *Leathermon* under the circumstances" [Mefford Aff., ¶36]. This statement in the Mefford Affidavit is particularly incredible with respect to this, the *Leathermon*, action. This suit was filed four months after *Means*, and, as indicated above, Mefford told the press at the time *Means* was filed that "he understands that his company has to be named as a current owner" [Rowlett Aff., ¶8 and

Exh. B].  In such circumstances, the Mefford Affidavit's recent assertion of "shock and surprise" at the inclusion of Grandview LLC as a defendant in this litigation simply is not credible.

Thereafter, on several occasions between October 12 and 17, 2007, Goebel had telephone conversations with Richard Mullineaux, of the Kightlinger & Gray law firm's New Albany office, one of counsel for Grandview LLC, about the possible removal of the case to federal court. During those conversations, Mullineaux raised a question about whether Eckert had a conflict of interest in representing the Plaintiffs in the case against Grandview LLC, because of certain work Eckert had performed for Mefford while Eckert was part of another law firm, Alcorn, Goering & Sage, LLC [Goebel Aff., ¶14].

A subsequent meeting occurred between Mullineaux and Goebel, Pitt and one of his partners, Merrill S. Schell, along with Eckert, on October 22, 2007 at Mullineaux's office in New Albany.  The primary purpose of that meeting was to discuss removal to this Court, the deadline for which was fast approaching. During that meeting, Mullineaux again raised the conflict of interest issue.  Eckert, who Goebel had asked to be present for that reason, responded that he believed that Mefford did not want Eckert to withdraw from the case and that he felt Mefford had no objection to Eckert being counsel of record for the Plaintiffs.  Goebel explained to Mullineaux that he was only associated with Mr. Eckert as "of counsel," and that, in light of the earlier telephone conversation between Goebel and Mullineaux about Eckert's alleged conflict, Goebel had filed a notice of change of address with the Court.  Mullineaux raised no question about either Goebel or Wyatt having a conflict of interest or needing to withdraw as counsel.  In fact, Mullineaux affirmatively stated that he did not believe Goebel had any conflict.  Subsequent to that meeting with Mullineaux, Eckert had no substantive involvement in the case.  He voluntarily moved to withdraw as counsel for the Plaintiffs on or about October 2, 2008, prior to an

impending pretrial conference in the case.  That motion was granted by Order entered October 7, 2008.  [Goebel Aff., ¶14-15; Pitt Aff., ¶17-18].[3]

Months passed.  Many depositions occurred on class certification and remand issues. Briefs were filed on remand and class certification issues.  Status conferences with the United States Magistrate Judge occurred.  The next any one of counsel for the Plaintiffs heard about any conflict of interest question was sometime during the week of April 13, 2009, when Goebel participated in a telephone call with Peter Tamulonis and Jeffrey Hawkins of Kightlinger & Gray's Indianapolis office, who also are counsel for Grandview LLC in this action along with Mullineaux. During that conversation, counsel for Grandview LLC threatened that unless Plaintiffs dismissed Grandview LLC as a defendant in this action, with prejudice, the case would turn into "thermo nuclear warfare," including a motion to disqualify both Goebel and Wyatt as counsel for Plaintiffs. Plaintiffs declined to acquiesce. Grandview LLC's Motion to Disqualify was filed on April 24, 2009 [Goebel Aff., ¶16].

This action was filed almost two years ago, on August 17, 2007.  As Grandview LLC readily acknowledges, it was well aware of Goebel's professional connection with Eckert as soon as the Complaint was served – indeed, even before the April 13, 2007 meeting.  And, at least as early as the October 22, 2007, meeting with Mullineaux, Grandview LLC was aware of the involvement, or potential involvement, of the Wyatt firm in this case.  Actually, according to Mefford, he became aware of Wyatt's potential involvement at the time of the April 13, 2007

---

[3] Grandview LLC states in its Memorandum that it made a "written demand" on Eckert to withdraw.  Its counsel did not attach a copy of the purported written demand to its Motion and have been unable to provide a copy of any such written demand.  None appears in the Court record.  In any event, there is no suggestion by Grandview LLC in its Brief that the alleged written demand -- if it was ever made -- requested withdrawal by anyone other than Eckert.

meeting [Mefford Aff., ¶29-30].  Goebel and Eckert have had pending against Grandview LLC two other state court actions involving individual plaintiffs' claims arising from the Cemetery. Kightlinger & Gray does not represent Grandview LLC in those cases and its counsel there, Wilmer Goering, has never moved to disqualify Goebel or Eckert [Goebel Aff., ¶17].  Grandview LLC is also a defendant in the *Means* litigation in Indiana state court.  Notwithstanding Mefford's severe criticism and accusations of conflict of interest on the part of Cohen & Malad in his Affidavit – and Grandview LLC's false statement at page 9 of its Memorandum that Cohen & Malad had been disqualified in *Means* – Grandview LLC has never sought to have that firm disqualified as plaintiffs' counsel in *Means* [Pitt Aff., ¶22].  But, again, Grandview LLC is not represented by Kightlinger & Gray in *Means*.  Grandview LLC's selective use of a motion to disqualify in this case against Goebel and the Wyatt firm, but not in the other cases in which it is a defendant, is evidence of the "thermo nuclear" option reaching fruition here.  It strongly undermines any suggestion of a bona fide corporate outrage against Goebel and Wyatt and equally strongly suggests the use of the Motion to Disqualify as a strategic litigation tactic.

Subsequent to the October 22, 2007 meeting, and through the end of April, 2009, Goebel's time records show that he has spent over 450 hours on this case. Wyatt's time records reveal that its attorneys, paralegals and summer associates have devoted over 1,600 hours between the October 22, 2007 meeting date and the date of the first filing of the Motion to Disqualify, and that Wyatt has incurred over $29,000.00 in expenses on behalf of the Plaintiffs in this action.  Had Grandview, LLC raised the question of their potential conflict in October 2007, when Mr. Eckert's potential conflict was mentioned -- and had it been successful -- the vast majority of the time invested in the case by Goebel and the Wyatt firm, and the expenses incurred, would have been avoided.

**ARGUMENT**

I.    **GRANDVIEW HAS WAIVED ITS RIGHT TO CHALLENGE ANY PERCEIVED CONFLICT OF INTEREST.**

The timing of Grandview LLC's current motion, filed on the eve of Plaintiffs' deadline to file their Motion to Amend the Complaint, is telling.  This tactical maneuver -- "thermo nuclear warfare" as Grandview LLC terms it -- should not be countenanced.  Grandview LLC and its lawyers have known about the alleged facts giving rise to their motion for nearly two years but they have chosen to sit on the purported information until now, when it can best be used to their advantage.  The law abhors such gamesmanship and holds that conflicts of interest are subject to waiver if not raised promptly.  Besides the fact that there is no conflict on either the part of Goebel or the Wyatt firm, the Court should deny these motions in the strongest terms.

The Seventh Circuit is clear that disqualification "is a drastic measure which courts should hesitate to impose except when absolutely necessary." *Cromley v. Board of Educ.*, 17 F.3d 1059, 1066 (7th Cir. 1994), *citing Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 721 (7th Cir. 1982); *see also Exterior Systems, Inc. v. Noble Composites, Inc.*, 210 F. Supp. 2d 1062, 1067 (N.D. Ind. 2002).  Because disqualifying an attorney destroys the attorney-client relationship of the party's choice, motions to disqualify "should be viewed with extreme caution for they can be misused as techniques of harassment." *Exterior Systems, Inc.*, 210 F. Supp. 2d at 1067, *quoting Freeman*, 689 F.2d at 722; *Chemical Waste Management, Inc. v. Sims*, 875 F. Supp. 501, 503 – 04 (N.D. Ill. 1995), *citing Richardson-Merrell, Inc. v Koller*, 472 U.S. 424, 436 (expressing the need for "concern about the 'tactical use of disqualification motions' to harass opposing counsel.").

Accordingly, the Seventh Circuit has held that: "A motion to disqualify should be made with reasonable promptness after a party discovers the facts which lead to the motion." *Kafka v.*

*Truck Insurance Exchange*, 19 F.3d 383, 386 (7th Cir. 1994), *citing Central Milk Producers Co-op. v. Sentry Food Stores, Inc.*, 573 F.2d 988 (8th Cir. 1978).  An unreasonable delay in filing a motion to disqualify "can be reasonably perceived as an admission that the principles of confidentiality and conflict of interest are not significantly related to the procedural integrity of the case."  *Chemical Waste*, 875 F. Supp. at 505.  Accordingly, "[w]aiver is a valid basis for the denial of a motion to disqualify; a former client who is entitled to object to an attorney's representation of an adverse party on the ground of conflict of interest but who knowingly refrains from asserting it promptly is deemed to have waived that right."  *Id.* at 504 – 05, *citing Trust Corp. of Montana v. Piper Aircraft Corp.*, 701 F.2d 85 (9th Cir. 1983); *Central Milk Producers Coop. v. Sentry Food Stores, Inc.*, 573 F.2d 988 (8th Cir. 1978); *Redd v. Shell Oil Co.*, 518 F.2d 311 (10th Cir. 1975); *Cox v. American Cast Iron Pipe Co.*, 847 F.2d 725 (11th Cir. 1988).

Courts uniformly find that a movant waives its right to challenge a perceived conflict of interest when it waits too long to file its motion to disqualify after the movant is put on notice of the facts giving rise to the motion.  The courts typically apply a five-factor test that examines: 1) the length of delay in bringing the motion; 2) when the movant learned of the conflict; 3) whether the movant was represented by counsel during the delay; 4) why the delay occurred; and 5) whether disqualification would result in prejudice to the nonmoving party.  *See Chemical Waste Management*, 875 F. Supp. at 505;  *Continental Holdings Inc. v. U.S. Can Co.*, No. 95-C-5743, 1996 WL 385346 at *1 (July 3, 1996, N.D. Ill.) (motion denied after twenty-one month delay); *Exterior Systems, Inc.*, 210 F. Supp. 2d at 1076 – 77 (N.D. Ind. 2002) (motion denied after twelve month delay); *Brennan v. Sun Healthcare Group*, No. IP 96-102-C-D/F, 1998 WL 1567451 at *8 (Jan. 29, 1998, S.D. Ind.) (motion denied after seventeen month delay); *Safe-T-*

*Products, Inc. v. Learning Resources, Inc.*, No. 01-C-9498, 2002 WL 31386473 at *8 (Oct. 23, 2002, N.D. Ill.) (partial waiver found after six month delay).

All five factors weigh against disqualification here of Plaintiffs' attorneys.  The Mefford Affidavit makes it clear that Grandview learned of the perceived conflict involving Goebel no later than August 17, 2007, when Plaintiffs filed the Complaint -- *twenty months* before it filed its Motion to Disqualify [Mefford Aff., ¶29].  Similarly, Grandview and its counsel learned of the Wyatt firm's involvement no later than the October 22, 2007 meeting at which Mullineaux, Grandview LLC's attorney, Goebel, and Pitt and Schell of the Wyatt firm, were present -- *eighteen months* before Grandview LLC filed its Motion to Disqualify.  Grandview LLC has been represented by numerous attorneys at least since the summer of 2006; when the litigation between Grandview LLC and Madison Funeral Services, Inc. began.  No explanation for the delay has been forthcoming.  There is certainly nothing in either Grandview LLC's Memorandum or the Mefford Affidavit to excuse it and any attempt by Grandview LLC to rehabilitate that failure in a Reply would clearly lack credibility.  They cannot claim the need to take discovery since the Mefford Affidavit is clear that all the underlying facts were known to Grandview no later than October 22, 2007.  Their motive for waiting so long certainly is suspect, when counsel for Grandview LLC has never moved to disqualify Goebel from any other litigation in which he has represented clients against Grandview LLC and when it never moved to disqualify the Cohen & Malad firm in the *Means* case despite the fact that the Cohen & Malad firm is the primary target of the accusations in Mefford's Affidavit.[4]  The delay in bringing this motion has not been, and cannot be, excused with any legitimate reasoning.

---

[4] Grandview LLC's statement at page 9 of its Memorandum that in *Means*, the related state court pre-need trust class action, "The Indianapolis law firm [Cohen & Malad] was likewise disqualified (continued…)

Finally, and most importantly, the resulting prejudice to the Plaintiffs likely would "result in termination of the lawsuit favorable to the defendants." *Central Milk Producers Co-op.*, 573 F.2d at 992.  The hours and associated costs that Goebel and the Wyatt firm have invested on Plaintiffs' behalf could preclude Plaintiffs from ever finding a new legal team reasonably willing and able to handle the matter.  Goebel and the Wyatt firm have spent thousands of hours researching, interviewing witnesses, reviewing documents, taking and defending depositions, and responding to discovery requests.  In addition, Plaintiffs' counsel have prepared and tendered to the Court an amended complaint for filing with the Court's leave and have responded to the Defendants' objections to that filing.

Even if Plaintiffs are able to retain new counsel, the attendant substantial delay to the Plaintiffs in obtaining the relief to which they are entitled would be unfairly prejudicial.  Even if a direct or imputed conflict did exist, had Grandview LLC filed its motion in the Fall of 2007, when counsel first raised the conflict issue, the Plaintiffs would not be subject to the prejudice they face at this point.  As Rhonda Wiley, one of the potential class representatives puts it,

> I believe Plaintiffs would be greatly prejudiced if they were removed as our attorneys.  Their disqualification would mean that the knowledge and information they have gained over the last two-plus years would be lost.  Their removal as our attorneys would certainly result in substantial additional delays in bringing the case to a conclusion.  Since the suit was filed, much time has been consumed on questions of removal and remand back to state court, as well as class certification, all of which was necessary, but which has delayed the substance of the case being decided.  We Plaintiffs would hardly know where to begin to find replacement attorneys and I am concerned that we would not be able to find competent counsel willing to step into this case at this stage.  I fear that the disqualification of Mr.

---

(…continued)

because of its association with Eckert," is palpably wrong.  Neither Grandview LLC nor any other party has ever moved to disqualify Cohen & Malad in *Means* and that firm remains counsel of record for the Plaintiffs there [Pitt Aff., ¶22].

Goebel and the Wyatt firm would effectively end our ability to continue the litigation to the injury of the hundreds or thousands of people who have been damaged as a result of the way Grandview cemetery has been operated for many years.

\* \* \* \*

In sum, I believe I, the other Plaintiffs, and the members of the large class of people we seek to represent, will be greatly prejudiced and damaged if the counsel of our choice are not permitted to remain as our attorneys and do not believe the Defendants should be able to benefit from having waited so long to raise the issue.

[Rhonda Wiley Affidavit (Exh. 4), ¶6, 18].

The law in the Seventh Circuit on waiver could not be clearer. Grandview LLC's decision to be less than candid about the impact of that law on their motion is troublesome. Its complete avoidance of the delay issue speaks volumes. Where, as here, the movant offers no explanation for its delay, any conflict is waived. Accordingly, Grandview has waived its opportunity to challenge Plaintiffs' counsel on the basis of any perceived conflict of interest. The motion to disqualify can and should be denied on this ground alone.

## II.     THERE IS NO DIRECT CONFLICT BECAUSE NO ATTORNEY-CLIENT RELATIONSHIP EXISTED.

Beyond the clear waiver here, it is equally obvious that there has been no conflict, either direct or imputed, on the part of Goebel and the Wyatt firm. For Goebel and the Wyatt firm to be subject to disqualification, they must have owed a professional duty to Grandview LLC. Without an attorney-client relationship, there can be no direct conflict of interest. *See Nelson v. Green Builders*, *Inc*. 823 F. Supp. 1439, 1444 (E.D. Wis. 1993) ("In addressing a motion to disqualify, the threshold question is whether there existed an attorney-client relationship that subjected a lawyer to the ethical obligation of preserving confidential communications."), *citing Westinghouse Electric Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311 (7th Cir. 1978). An attorney-client relationship arises "when the lay party submits confidential information to the law party with

reasonable belief that the latter is acting as the former's attorney." *Westinghouse Electric Corp.*, at 1312; *International Paper Co. v. Lloyd Mfg. Co., Inc.*, 555 F. Supp. 125, 132 (N.D. Ill. 1982); *DCA Food Industries, Inc. v. Tasty Foods, Inc.*, 626 F. Supp. 54, 59 (W.D. Wis. 1985); *Nelson*, 823 F. Supp. at 1445.

Grandview LLC tellingly points to no facts giving rise to such a duty. As a basis for its conflict of interest challenge, Grandview LLC relies primarily on Mefford's presence at a meeting with Goebel and Pitt months before this case was filed. His theory is that Goebel and the Wyatt firm were "his attorneys" at that point, and consequently, Goebel and the Wyatt firm cannot represent the Plaintiffs in this case. This theory fails for several reasons.

A. **The Presence of Rowlett and Nay at the April 13, 2007 Meeting Renders Non-Confidential Any Communications Between Mefford, Goebel and Pitt**

Two members of the Volunteer Committee, Terry Rowlett and Rodney Nay, were present during the April 13, 2007 meeting that Grandview LLC claims gave rise to an attorney-client relationship between it, on the one hand, and Goebel and the Wyatt firm, on the other. Under the law in this Circuit, a would-be client cannot impart confidential information to an attorney in the presence of third parties, and such communications cannot give rise to an implied attorney-client relationship.

The Seventh Circuit held in *United States v. Keplinger*, 776 F.2d 678 (7th Cir. 1985) that the presence of a third party at a meeting between a purported client and an attorney meant that the would-be client did not reveal confidential information to the attorney. As such, no attorney-client relationship arose. In affirming the district court, the Seventh Circuit noted in *Keplinger*, "Finally, the court found that communications made by the defendants were not in confidence, both because the information communicated was intended to be disclosed . . . to the FDA's

21

inquiries and because most of defendants' statements to attorneys were made in the presence of third parties." *Id.* at 700; *accord Pacific Dunlop Holdings, Inc. v. Barosh*, No. 91-C-2, 1992 WL 168535 (July 14, 1992, N.D. Ill.).

Therefore, even if Mefford could somehow have reasonably believed Goebel and Pitt were Grandview LLC's lawyers during the April 13, 2007 meeting, the exchange between them in the presence of two other people, Rowlett and Nay, rendered the communications non-confidential and not protected by the attorney-client privilege.

### B.   Mefford Never Shared Confidential Information with Mr. Goebel or the Wyatt Firm.

#### 1. The Information Provided by Mefford During the Meeting Regarding Drainage Problems at the Cemetery was Generally Known

Grandview LLC cannot establish that Mefford had an attorney-client relationship with Goebel or Pitt because he never discussed confidential information with them at that April 17, 2007 meeting or at any other time.  Indeed, Mefford does not even attempt to identify any confidential information because there was no such exchange.  His generalized assertions of "educating" the Plaintiffs' counsel as to the factual nature of the flooding problems is not sufficient.  During the course of the April 13, 2007 meeting, Mefford only discussed information that he previously had broadcast to public audiences. [Rowlett Aff., ¶8; Goebel Aff., ¶11; Pitt Aff., ¶12] This kind of information cannot give rise to a confidential attorney-client relationship. *See* Restatement (Third) of The Law Governing Lawyers § 59.

> Confidential client information consists of information relating to the representation of a client, other than information that is generally known." (emphasis added).  Comment (d) explains that "[c]onfidential client information does not include information that is generally known.  Such information may be employed by a lawyer who possesses it in permissibly representing other clients and in other contexts where there is a specific justification for doing so. Information might be generally known at the time it is conveyed to the lawyer or it might become generally known thereafter.

Grandview LLC also argues that Goebel and the Wyatt firm would not have had access to the Cemetery documents but for their duping Mefford into turning them over.  But, as explained earlier, those are not the facts.  Mefford is wrong again.  Contrary to Mefford's Affidavit, he **voluntarily** provided most of the documents **to the Volunteer Committee** in November 2006, as part of his ongoing campaign to help the Volunteer Committee's cause, **long before Goebel and Pitt ever entered the picture** [Rowlett Aff., ¶9].[5]  In any event, those Cemetery documents, although voluminous in size, contain no relevant information regarding the substance of the Complaint – the water and drainage problems of the Cemetery.  In discovery, Grandview LLC has had full access to those records and tellingly makes no reference as to any specific records or documents that leads to a contrary conclusion.

### 2.   The Information Provided By Mefford Was Not Confidential Because It Is Discoverable

All of the information that Mefford disclosed to the Volunteer Committee (and the general public) and later discussed with Goebel and Pitt (and Nay and Rowlett), in addition to already having been made public, is properly discoverable, and thus not confidential or privileged for purposes of disqualification.  Discoverable information is not confidential:

> In the doctor's brief the only actual example of the claimed conflict which is cited is a verbatim section of the deposition transcript where defendants' counsel inquires about how long the doctor has been a professional corporation, whether his business expenses are run through the corporation, whether he is basically a paid employee of the corporation, whether he draws a salary, and a final question about whether his self-insurance is accomplished by maintaining a pool or if the doctor's professional corporation is deemed adequate for the purpose.  Some of that information would be available from state records, some questions are almost self-answering, *but in any event all properly discoverable, and obviously could not have been considered confidential information passed by the doctor to his then-attorneys*.  The hospital attorneys' prior representation of the doctor in other

---

[5] Grandview LLC's counsel did not dispute that fact after Goebel made it clear to him in a letter dated May 7, 2009 [Goebel Aff., ¶18, Exh. B.]

matters gave the defendants no advantage or insight into his professional corporate affairs of any consequence.  We have no basis to disturb Judge Baker's factual findings.  If the district court's findings had been otherwise the doctor would, of course, have a legitimate and well-recognized complaint.

*Castillo v. St. Paul Fire & Marine Ins. Co.*, 938 F.2d 776, 778 (7th Cir. 1991) (emphasis added).

*See also Brennan v. Sun Healthcare Group, Inc.*, No. IP 96-102-C-D/F, 1998 WL 1567451 (Jan. 29, 1998, S.D. Ind.) ("[B]ecause the identified information is not privileged and is relevant to the claims and/or counterclaims in this cause, then it was properly discoverable in this action.  Thus, M.C.W.'s representation of the Brennans during the merger negotiations gave it no advantage in this litigation and should not constitute grounds for M.C.W.'s disqualification.").

Accordingly, because Mefford only discussed generally known and discoverable information with Plaintiffs' attorneys and others in the room, those disclosures cannot form the basis of a confidential attorney-client relationship.

### C.   Mefford Could Not Have Reasonably Believed that Goebel and the Wyatt Firm Were Acting on Grandview LLC's Behalf.

The second requirement for the formation of an attorney-client relationship is that the putative client hold a *reasonable* belief that the attorney is acting on his behalf.  Here, if Mefford believed that Goebel and the Wyatt firm were acting on his behalf, his conclusion was patently unreasonable.  In *Central Die Casting Mfg. Co., Inc. v. Tokheim Corp.*, No. 93-C-7692, 1994 WL 233653 (May 25, 1994, N.D. Ill.) two related entities, "A" and "B," had engaged in the preliminary adversarial back-and-forth typically preceding litigation.  Before a lawsuit officially separated the parties, however, party "B" decided to investigate whether it would have a claim against party "C."  The investigation required looking through the confidential records of party "A."  Party "A" gladly obliged with "B's" attorneys' requests for documents because "A" held the belief that the "B" v. "C" lawsuit would ultimately benefit "A" as well.

When "A" and "B" eventually found themselves on opposite sides of litigation, the Court found that "B's" attorneys were allowed to continue representing "B" and to use the documents and other information uncovered during the previous investigations, because "B's" attorneys never represented "A."   The Court found that "A's" belief to the contrary was unreasonable because "A" stood to gain only a hypothetical, rather than a certain, benefit from disclosing its records, and because "A" was aware that its interests were adverse to "B's" on account of their previous dealings. *Central Die Casting*, 1994 WL 233653 at *2 – *4 (distinguishing the types of implied attorney-client relationships found in *Kerr-McGee*, 580 F.2d 1311, and *Analytica, Inc. v. NPD Research, Inc.*, 708 F.2d 1263 (7th Cir. 1983)).  *See also Lycan v. Walters*, 904 F. Supp. 884, 907 – 10 (S.D. Ind. 1995) (determining that a movant's belief that an attorney represented her was unreasonable based on a review of deposition testimony that reads strikingly similar to Mr. Mefford's deposition testimony).

The same situation is present here.  Mefford may have subjectively believed that helping the Volunteer Committee by providing documents to it (that are discoverable, in any event), and by cooperating with the Volunteer Committee's counsel in laying out the factual background of the situation could also somehow benefit Grandview LLC in the public eye or otherwise.  His willingness to cooperate is duly documented in the media [Rowlett, Aff., ¶8 and Exh.'s B, C, D].  To the extent that all parties benefit when they, including potential adversaries, approach a situation with a mind to cooperate in the interests of justice, he was correct.  However, legally speaking, Mefford was undeniably on notice that Grandview LLC's interests were not ultimately aligned with those of the Volunteer Committee.  After all, the Committee was made up of family members injured by the acts or failures to act of the Cemetery's owners and operators, and ***Mefford's limited liability company owned the Cemetery***.  When Goebel and the Wyatt firm

were introduced to him on April 13, 2007 as attorneys investigating the potential for a class action lawsuit,[6] Mefford had no reasonable basis to believe that his and Grandview LLC's positions in litigation would be anything other than adverse to those of the potential class.  In fact, Goebel and Pitt immediately advised Mefford that under Indiana statutory law it was likely that Grandview LLC would have to be made a defendant [Rowlett, Aff., ¶7; Goebel Aff.,¶10; Pitt Aff., ¶7].  He knew Goebel already represented the Volunteer Committee, whose interest were obviously inimical to those of Grandview LLC [Rowlett Aff., ¶6].  Grandview LLC was already represented by Wilmer Goering in litigation relating to the Cemetery.  Mefford could not have reasonably thought that Goebel and Pitt were at the April 13, 2007 meeting to represent Grandview LLC and act on its behalf.

Not only do the circumstances render Mefford's purported belief -- expressed so many, many months after this case was filed - - unreasonable, so also do his prior dealings with the Volunteer Committee.  In paragraphs 23 through 25 of his Affidavit, Mefford explains that, although he had hoped to avoid litigation in the *Means* case, members of the Volunteer Committee ultimately decided to name Grandview LLC as a defendant in April 2007.  Mefford learned that information (he thinks) before he ever attended a meeting with Cohen & Malad regarding the *Means* litigation, and certainly before he ever attended the April 13, 2007 meeting with Goebel and the Wyatt firm regarding this then-potential lawsuit.  Therefore, Mefford urges this Court to conclude that, although he was aware that the Volunteer Committee was about to sue him in the related trust matter (the *Means* case), he nevertheless believed that attorneys acting

---

[6] Mefford Depo., pp. 190 – 91 (recounting that Goebel and later the Wyatt firm "asked . . . if they could come in because maybe the two of them were going to go together and approach this – I'll call it the 'water in the grave' class action.").

on behalf of the Volunteer Committee were also representing him.  If Mefford held such a belief, it was an absurd one.

Perhaps Mefford's memory of these events is cloudy.  After all, Grandview LLC waited 20 months after this action was filed to make its motion.  Contrary to his Affidavit, Mefford did not meet Goebel "around the time that Mefford first met with Cohen & Malad attorneys." At that point, in the Fall of 2000, Goebel was still a minister; he did not resume the practice of law until February 1, 2007.

Like the movant in *Central Die Casting*, any benefit that Mr. Mefford stood to gain from cooperating with the Volunteer Committee and its attorneys was merely a "hypothetical" public relations benefit.  It was far from "certain."  Therefore, Mefford's purported belief that Goebel and the Wyatt law firm were acting as his agents was unreasonable, particularly when both attorneys advised him that his company would likely have to be sued and even got from him the Grandview LLC liability insurance policy.  No attorney-client relationship arose between them. Accordingly, Goebel and the Wyatt firm owed no duty as counsel to Mefford or Grandview LLC and they do not suffer from any direct conflict of interest.

### III.   NONE OF THE PLAINTIFFS' ATTORNEYS SUFFERS FROM AN IMPUTED CONFLICT OF INTEREST.

Assuming for the sake of argument that Grandview LLC's "association" theory is appropriate, the questions arise: 1) Did Mr. Eckert have a conflict of interest; 2) Can that conflict be imputed to Goebel; and 3) Can that conflict be re-imputed from Mr. Goebel to the Wyatt firm?

#### A.   Eckert Had No Conflict That Could Serve as the Basis of an Imputed Conflict.

Ind. R. Prof'l Responsibility 1.9(a) provides:

A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or substantially related matter in which that

person's interests are materially adverse to the interests of the former client unless
the former client gives informed consent, confirmed in writing.

Therefore, if the present matter is "substantially related" to the matter in which Eckert formerly

represented Grandview LLC, then Eckert had a conflict and his withdrawal was necessary.

The Seventh Circuit has established that an attorney is disqualified from representing a

client in a matter adverse to a former client if each element of the "substantially related" test is

satisfied.  *See Westinghouse Electric Corp. v. Gulf Oil Corp.*, 588 F.2d 221, 224 – 25 (7th Cir.

1978); *Novo Terapeutisk Laboratorium A/S v. Baxter Travenol Laboratories, Inc.*, 607 F.2d 186,

189 – 90 (7th Cir. 1979);  *Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 722 n.10

(7th Cir. 1982); *Analytica, Inc. v. NPD Research, Inc.*, 708 F.2d 1263, 1266 – 67 (7th Cir. 1983);

*Cromley v. Board of Education*, 17 F.3d 1059, 1064 (7th Cir. 1994).  As the Seventh Circuit

originally recognized in *Westinghouse Electric Corp.*,

> [T]he determination of whether there is a substantial relationship turns on the
> possibility, or appearance thereof, that confidential information might have
> been given to the attorney in relation to the subsequent matter in which disqualification
> is sought.  The rule does not necessarily involve any inquiry into the imponderables
> involved in the degree of relationship between the two matters but instead involves
> *a realistic appraisal of the possibility that confidences had been disclosed in the
> one matter which will be harmful to the client in the other.*

*Id.,* 588 F.2d at 224 (emphasis added).

The "substantial relationship" test requires a three-part inquiry.  The first part requires the

trial court to "make a factual reconstruction of the scope of the prior legal representation."  *Id.* at

225.   Next, the court must determine "whether it is reasonable to infer that the confidential

information *allegedly given* would have been given to a lawyer representing a client in those

matters."  *Id.*  And, "[f]inally, it must be determined whether that information is relevant to the

issues raised in the litigation pending against the former client."  *Id.*

According to Mefford, Eckert formerly represented Mefford in matters relating to Mefford's purchase of Grandview Memorial Gardens from Madison Funeral Services, Inc. [Mefford Aff., ¶2-6]  As such, it is reasonable to conclude that Eckert and Mefford exchanged information relating to the decision regarding the choice of Mefford's legal entity and the formation of that entity, Grandview LLC.  Likewise, it is reasonable to conclude that Eckert had access to all of the information and documents required to complete Grandview's purchase of the Cemetery.  Eckert's knowledge of that information is not relevant to this case.  Plaintiffs here can make no meaningful use of the information Eckert may have learned relating to Mr. Mefford's choice of entity or Mefford's motivations and strategies in completing the purchase. This case basically concerns water and drainage problems and an improperly installed or non-existent lawn crypt drainage system – information that, according to Mefford, he did not know prior to purchasing the Cemetery and that he did not learn until approximately July, 2006 [Mefford Depo at 3, 15].  He could not have divulged to Eckert something in 2005 -- when Grandview LLC was formed – that he admits he did not know until 2006.

The second prong of the substantial relationship test requires examining "whether it is reasonable to infer that the confidential information *allegedly given* would have been given to a lawyer representing a client in those matters."  *Gulf Oil*, 588 F.2d at 225.  Here, the only information that Grandview LLC alleges to have imparted is not confidential.  Grandview LLC does allege that Mefford discussed with Eckert the issues relating to lawn crypt drainage and water collecting in gravesites, and that Mefford disclosed relevant Cemetery documents to Eckert. And, because Mefford simultaneously disclosed this information to the public and the media, there can be no credible claim that this information was "confidential" under the Rules of  Professional

Conduct, which is what the substantial relationship test is designed to protect. *Westinghouse Electric Corp.*, 588 F.2d at 224; *Freeman*, 689 F.2d at 721.

Mefford spoke at public meetings over a year before this action was filed in which he disclosed the same information that he now claims is private [Rowlett Aff., ¶8, Exh. C; Pitt Aff., ¶12]. Likewise, contrary to his Affidavit, Mefford *volunteered* Cemetery documents to the Volunteer Committee in November of 2006 [Rowlett Aff., 9; Goebel Aff., 8]. Information that is discoverable or generally known cannot form the basis of a disqualifying conflict of interest. *See* Ind. R. Prof'l Responsibility 1.9 cmt. (3)("Information that has been disclosed to the public or to other parties adverse to the former client ordinarily will not be disqualifying."); *Castillo v. St. Paul Fire & Marine Ins. Co.*, 938 F.2d 776, 778 (7th Cir. 1991); *Brennan v. Sun Healthcare Group, Inc.*, No. IP 96-102-C-D/F, 1998 WL 1567451 (Jan. 29, 1998, S.D. Ind.); RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 59 cmt (d) (2000). Therefore, Grandview LLC does not allege facts sufficient to establish a reasonable inference that confidential information disclosed in the prior Eckert representation may be used against it in this litigation.

Accordingly, Eckert's prior representation of Mefford may not serve as the basis for imputing a conflict of interest either to Goebel or, in turn, to the Wyatt firm.

> **B.      Any Conflict on Eckert's Part Cannot Be Imputed to Goebel Because the Two Are Not a "Firm" and Because Goebel Did Not Actually Learn of Relevant Confidential Information Relating to The Former Representation.**

Assuming that Eckert had a conflict of interest because of his representation of Mefford, the question becomes whether the confidential information Eckert learned during the representation should be imputed to Goebel. Imputation is governed by Ind. R. Prof'l Responsibility 1.10, regulating imputation of confidential information among lawyers associated in

a firm: "While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so . . . ."

Imputation is improper in this instance because Eckert and Goebel were not members of the same law firm, and they maintained sufficiently distinct law practices to avoid the necessity of imputing one's confidential knowledge to the other [Goebel Aff., ¶¶4, 7, 8, 12].

Comment 1 to Ind. R. Prof'l Responsibility states, "Whether two or more lawyers constitute a firm within this definition can depend on the specific facts."  And, Restatement (Third) of The Law Governing Lawyers states at section 123 comment c(ii) that ". . . the relationship between an 'of counsel' lawyer and the firm may be shown to be so attenuated . . . that there is no significant risk of compromising client confidentiality or otherwise providing a basis for imputation."  Goebel and Eckert have separate offices, in separate towns, over fifty miles apart.  Each attorney maintains his own files in his own offices.  Neither attorney has access to the other attorney's computer databases.  Goebel does not even have a key to Eckert's office.  They each employ their own staff [Goebel Aff., 4].  None of the indicia of a true law firm are present in their relationship.  Moreover, Eckert did not in fact disclose any confidential information to Goebel.

In any event, by June 2006, well before Goebel and Eckert took on the "of counsel" designation, Grandview LLC retained Wilmer Goering to represent its interests in litigation with respect to the Cemetery.  Eckert left Alcorn, Goering & Sage, LLC in 2006.  Mefford and Grandview LLC were represented by Goering as to Cemetery matters at the time Eckert and Mr. Goebel began their symbiotic, but loose, affiliation in early 2007.  Therefore, even assuming that Goebel and Eckert constituted a "firm" for the purposes of Rule 1.10, any presumption of shared confidences regarding Eckert's former representation of Mr. Mefford is rebuttable: "[T]he

presumption of shared confidences has been found to be irrebuttable only when an entire law firm changes sides . . . and not when one attorney changes sides." *Cromley v. Board of Educ.*, 17 F.3d 1059, 1066 (7th Cir. 1995) *citing Analytica Inc. v. NPD Research Inc.*, 708 F.2d 1263, 1267 (7th Cir. 1983); *see also Freeman  v. Chicago Musical Instrument Co.*, 689 F.2d 715, (7th Cir. 1982). Therefore, if Goebel did not *actually* receive confidential information regarding the subject matter of this action based on Eckert's former representation of Mefford or Grandview LLC -- and he avers that he did not -- Goebel has no conflict of interest under an imputation theory.

Eckert did not discuss with Goebel anything Mefford had told him concerning the drainage issues at the Cemetery that underlie this case beyond what Mefford had made public months before [Goebel Aff., ¶8].  Nor did Goebel have access to the Mefford or Grandview LLC files in Eckert's office by virtue of Goebel's relationship with Eckert.  Eckert and Goebel also instituted certain internal mechanisms to ensure against the kind of imputation that might otherwise occur.  Their offices are in different communities.  They do not share staff or file space. Their computer systems are password protected [Goebel Aff., 4].  Along with Goebel's sworn affidavit, these kinds of internal mechanisms are sufficient to rebut the presumption of shared confidences.  *See Cromley*, 17 F.3d at 1065 (affidavits explaining that no-confidences were shared, along with prohibition on disclosing information relating to prior representations, separate file space, and certain other procedures have been found to protect client confidences).  Under these facts and the law in this Circuit, Goebel does not suffer under an imputed conflict of interest by virtue of his office sharing association with Eckert.

C.     **No Conflict Can Be Imputed to the Wyatt Firm Because Double-Imputation Is Not a Valid Legal Theory.**

Grandview LLC goes so far as suggesting that Eckert's perceived conflicts should be imputed to the Wyatt firm on a second-hand basis.  The facts demonstrate no occasion for any

such strained imputation.  Grandview LLC does not dispute that it was Goebel, rather than Eckert, who introduced the Wyatt firm to this matter.[7]  Consequently, any conflict of interest on the Wyatt firm's part stemming from Eckert's former representation of Mefford must travel through Goebel's non-existent imputed conflict.  This kind of imputation-on-an-imputation is not a valid basis for disqualification.  Furthermore, neither Eckert (nor Goebel, since he had none) even shared with Pitt or other Wyatt firm lawyers any confidential information gained from Mefford relating to the Cemetery drainage issues which form the basis of this case.

The Fifth Circuit dealt with virtually identical facts in *American Can Co. v. Citrus Feed Co.*, 436 F.2d 1125 (5th Cir. 1971).  There, a Mr. Erickson represented the Prossers against the Internal Revenue Service in a tax matter.  Erickson's partner, Allison, served as local counsel to the prominent Covington & Burling law firm against the Prossers in a collection action.  The court never determined whether the prior matter was sufficiently "substantially related" to the latter because, regardless, "new partners of a vicariously disqualified partner, to whom knowledge has been imputed during a former partnership, are not necessarily disqualified: they need show only that the vicariously disqualified partner's knowledge was imputed, not actual." *Id.* at 1129.  The Court reasoned, "If the Prossers' rationale were accepted, imputation and consequent disqualification could continue ad infinitum," *id.*, and, "[c]arriage of this imputation-on-an-imputation to its logical terminus could lead to extreme results in no way required to maintain public confidence in the bar." *Id.*  Therefore, because Allison's conflict was imputed -- not actual -- the Court denied the motion to disqualify Covington & Burling.  *Accord, Hillcrest Memorial*

---

[7] Grandview LLC Memorandum, p.10, ("Then, attorney Goebel brought in the Wyatt law firm, supposedly because of the breadth and complexity of the issues.  Exhibit 5, p.191 [sic].")

*Park, Inc. v. First Federal Savings and Loan*, No. 84-C-2224, 1985 WL 2531 (Sept. 12, 1985, N.D. Ill.).

As discussed above, Goebel suffers from *no* conflict, imputed or actual. However, for Grandview to establish that the Wyatt firm is tainted under this theory, it would need to show that Eckert *actually shared* with Goebel *confidential information* concerning the subject matter of this action that Eckert **learned during his prior representation of Mefford**. Not only do none of the facts support this conclusion, but Grandview LLC makes no attempt to argue otherwise. Nor did Eckert share confidential information relating to this action with the Wyatt firm that Eckert learned during his representation of Mefford [Pitt Aff., ¶13].

<u>CONCLUSION</u>

The fact that Grandview LLC waited twenty months after this suit was filed to move to disqualify Plaintiffs' counsel not only amounts to a waiver of any conflict argument it might have had, but also says much about this Defendant's true motivation. By Mefford's own admission, he and Grandview LLC knew each and every fact asserted by him in his Affidavit at least by the time this action was filed on August 17, 2007. Yet the corporate Defendant sat on those alleged facts until Plaintiffs' counsel had invested over 2,000 hours of time and almost $30,000 in expenses in the case in order to use them as a part of its threat to go "thermo-nuclear" if Grandview LLC's conditions were not met. Were there some true basis in fact for a conflict claim, and had Grandview LLC only recently learned of that basis, then its current motion might be viewed differently. As it is, however, Grandview LLC's gross delay, accompanied by no persuasive explanation on its part to excuse the delay -- indeed, no explanation at all -- requires denial of its motion. That delay, coupled with the woeful failure of Grandview LLC to adequately support its claim that Goebel and Pitt directly represented it during the April 13, 2007 meeting, and the

affidavits rebutting any presumption as to the disclosure of confidential information that might exist, lead to the inescapable conclusion that Grandview LLC's motion must be denied in the strongest terms.

Respectfully submitted,

J. Anthony Goebel
GOEBEL LAW OFFICE
1034 Copperfield Drive
Georgetown, Indiana 47122
812.951.2500
Fax: 812.951.2522
tony@goebellawoffice.com

/s/M. Stephen Pitt
M. Stephen Pitt
Merrill S. Schell
Jean W. Bird
WYATT, TARRANT & COMBS, LLP
2800 PNC Plaza
500 W. Jefferson St.
Louisville, Kentucky 40202
502.589.5235
mspitt@wyattfirm.com
mschell@wyattfirm.com
jbird@wyattfirm.com

Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on June 26, 2009, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to the following:

- **Robert Lewis Barlow , II**
  BARLOW LAW OFFICE
  rbarlow@blueriver.net,rbarlow@seidata.com
- **Andrew Lorin Campbell**
  BAKER & DANIELS LLP
  andrew.campbell@bakerd.com,denise.fort@bakerd.com
- **John Francis Carroll**
  GWIN STEINMETZ MILLER & BAIRD, PLLC
  jcarroll@gsmblaw.com
- **Joseph A. Colussi**
  COLUSSI LAW OFFICE
  colussilaw@msn.com,colussilawtll@msn.com,colussilawdag@msn.com
- **John B. Drummy**
  KIGHTLINGER & GRAY
  jdrummy@k-glaw.com,sclevenger@k-glaw.com
- **G. Karl Fanter**
  BAKER & HOSTETLER LLP
  kfanter@bakerlaw.com
- **J. Anthony Goebel**
  GOEBEL LAW OFFICE
  tony@goebellawoffice.com,jandb2day@yahoo.com
- **Jeffrey D. Hawkins**
  KIGHTLINGER & GRAY
  jhawkins@k-glaw.com,brevercomb@k-glaw.com
- **Pamela J. Hensler**
  MALLOR CLENDENING GRODNER & BOHRER LLP
  phensler@mcgb.com
- **Scott Christopher Holbrook**
  BAKER & HOSTETLER LLP
  sholbrook@bakerlaw.com
- **Lonnie D. Johnson**
  MALLOR CLENDENING GRODNER & BOHRER
  ljohnson@mcgb.com,jfries@mcgb.com,mmccutch@mcgb.com
- **Donald L. Miller , II**
  GWIN STEINMETZ MILLER & BAIRD PLLC
  dmiller@gsmblaw.com
- **Richard T. Mullineaux**
  KIGHTLINGER & GRAY, LLP
  rmullineaux@k-glaw.com

- **William H. Mullis**
  whm@mullislaw.com
- **Ronald Shig Okada**
  BAKER & HOSTETLER LLP
  rokada@bakerlaw.com
- **M. Stephen Pitt**
  WYATT TARRANT & COMBS LLP
  mspitt@wyattfirm.com,scarter@wyattfirm.com
- **James W. Riley , Jr**
  RILEY BENNETT & EGLOFF LLP
  jriley@rbelaw.com
- **Merrill S. Schell**
  WYATT TARRANT & COMBS
  mschell@wyattfirm.com,fwilkey@wyattfirm.com
- **John Joseph Tanner**
  BAKER & DANIELS
  jjtanner@bakerd.com,susan.trenary@bakerd.com
- **Michael Wroblewski**
  KIGHTLINGER & GRAY
  mwroblewski@k-glaw.com,arussell@k-glaw.com,wroblewski1991@yahoo.com

/s/M. Stephen Pitt
One of Counsel for Plaintiffs

20315548.7
6/26/2009 5:27 PM