UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY  DIVISION

|  |  |  |
|---|---|---|
| DELMAR H. LEATHERMON, | ) | |
| MARGARET L. LEATHERMON, | ) | |
| RHONDA WILEY, JOHN J. JAYNES, | ) | |
| TERRY ROWLETT and KAREN S. | ) | |
| ROWLETT on behalf of themselves and all | ) | |
| others similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | 4:07-cv-137-SEB-WGH |
| | ) | |
| GRANDVIEW MEMORIAL GARDENS, | ) | |
| INC., JIMMY W. SIMPSON, CARRIAGE | ) | |
| FUNERAL SERVICES OF INDIANA, | ) | |
| CARRIAGE CEMETERY SERVICES, | ) | |
| INC., a wholly owned subsidiary of Carriage | ) | |
| Services, Inc., CARRIAGE SERVICES, | ) | |
| INC., JAMES R. HOLT, MADISON | ) | |
| FUNERAL SERVICE, INC. and | ) | |
| GRANDVIEW MEMORIAL GARDENS, | ) | |
| LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING DEFENDANT GRANDVIEW MEMORIAL GARDENS,
LLC'S MOTION TO DISQUALIFY PLAINTIFFS' COUNSEL**

This cause is before the Court on the Motions to Disqualify Counsel filed by

Defendants Jimmy W. Simpson [Docket No. 149] and Grandview Memorial Gardens,

LLC [Docket No. 152], on April 22, 2009 and April 24, 2009, respectively.  A hearing

was held on December 22, 2009, in New Albany, Indiana, and continued in Indianapolis,

Indiana, on January 14, 2010, at which the parties presented both documentary and

testimonial evidence.  Having considered the parties' extensive briefing as well as the

documentary and testimonial evidence presented at the hearing, the Court <u>GRANTS</u>

Grandview Memorial Gardens, LLC's Motion to Disqualify.[1]

### **Factual Background**

Plaintiffs are a putative class of individuals who, throughout a forty-year period of

time, purchased burial goods and services from various representatives of Grandview

---

[1] Plaintiffs contend that Defendant Jimmy Simpson lacks standing to bring a motion to disqualify because Plaintiffs' counsel never represented Grandview LLC or Mr. Mefford in any matter, and thus, is unable to show that he has been personally injured by the representation.  Mr. Simpson rejoins that because his entity is a former owner of the Cemetery, he is in privity with Grandview LLC, and conduct which causes harm to Grandview LLC also causes harm to him.  Accordingly, he contends that he has standing to bring a motion to disqualify in this matter.

There are no Seventh Circuit cases addressing this issue in the civil context.  However, the First, Fourth, and Fifth Circuit Courts of Appeals have addressed the issue and have found standing for a third party to bring a motion to disqualify under the rationale that any member of the bar is authorized to report potential ethical violations committed in a case.  See <u>Kevlik v. Goldstein</u>, 724 F.2d 844, 847-48 (1st Cir. 1984); <u>United States v. Clarkson</u>, 567 F.2d 270, 271 n.1 (4th Cir. 1977); <u>Brown & Williamson Tobacco Corp. v. Daniel Int'l Corp.</u>, 563 F.2d 671, 673 (5th Cir. 1977).  The Northern District of Illinois has also addressed this issue in a number of unpublished cases, finding that, to have standing to bring a disqualification motion, the moving party must show evidence "clearly calling into question the fair or efficient administration of justice."  <u>Rudzinski v. Metro. Life Ins. Co.</u>, 2007 WL 3171338, at *4 (N.D. Ill. Oct. 25, 2007) (quoting <u>Tizes v. Curico</u>, 1997 WL 116797, at *2 (N.D. Ill. March 12, 1997)).

This Court has also addressed this issue in the civil context.  In <u>Emmis Operating Co. v. CBS Radio, Inc.</u>, 480 F. Supp. 2d 1111 (S.D. Ind. 2007), Judge McKinney engaged in a lengthy and thorough discussion of the issue, ultimately granting a disqualification motion filed by a non-party, finding that the movant had standing under either the construct set forth by the First, Fourth, and Fifth Circuit Court of Appeals or under the more stringent standard articulated by the Northern District of Illinois.  So it appears to be the case here.  However, we need not engage in an extended analysis of this question.  To the extent that Defendant Simpson has standing, his motion to disqualify is moot because, for the reasons detailed below, we grant Defendant Grandview LLC's identical motion.  Accordingly, we hereby <u>DENY AS MOOT</u> Defendant Simpson's Motion to Disqualify.

Memorial Gardens Cemetery ("the Cemetery"), located in Madison, Indiana.  On April 17, 2007, Plaintiffs filed this proposed class action against current and former owners or primary shareholders of the Cemetery.  We address the facts underlying the lawsuit only to the extent that they are relevant to the issues underpinning the motions to disqualify now before the Court.

**Grandview LLC's Purchase of the Cemetery**

In the fall of 2004, Keith Mefford, member/manager of Defendant Grandview Memorial Gardens, LLC, the current owner of the Cemetery, began selling pre-need funeral packages in Indiana.  In connection with that business, he became acquainted with Defendant Jim Holt, whose entity, Madison Funeral Service, Inc., was at that time the owner of the Cemetery.  In February or March of 2005, Mr. Mefford entered into discussions with Mr. Holt regarding the possibility of purchasing the Cemetery.  In April 2005, Mr. Mefford consulted John Eckert,[2] who was then the managing partner at the law firm now known as Alcorn, Goering & Sage,[3] about the possible transaction and that day the two had what Mr. Mefford characterized as "a very generic conversation about the cemetery."  Mefford at 23.

Mr. Eckert claims that, at the time he was consulted about the possible transaction,

---

[2] Mr. Eckert had previously represented Mr. Mefford on a completely unrelated matter.

[3] At the time, Mr. Eckert was a named partner of the firm, which was known as Eckert, Alcorn, Goering & Sage.  Eckert at 30.

Mr. Mefford showed him (Eckert) a fairly complete draft of an agreement for the purchase of the Cemetery that had been negotiated by Mr. Mefford and Mr. Holt.  Mr. Eckert testified that he was initially quite concerned about the transaction, primarily because no due diligence had been done.  Eckert at 32-33.  However, he eventually advised Mr. Mefford that, if he (Mefford) was intent on purchasing the Cemetery, he should form a limited liability company to make the purchase so as to limit his individual liability.  Eckert at 33.  In June 2005, Mr. Eckert assisted Mr. Mefford, along with his wife and his wife's parents, in forming Grandview Memorial Gardens, LLC ("Grandview LLC") by filing the necessary documents with the State of Indiana.  Eckert at 36.  Throughout that same time period, Mr. Eckert and Mr. Holt's counsel continued to negotiate some of the terms in the purchase agreement.  Mr. Eckert ultimately added a few paragraphs to the agreement, which provided that Mr. Holt and/or his entity would be responsible for: (1) any outstanding liabilities that occurred prior to the date of purchase and; (2) indemnification if there was any breach for attorneys' fees, costs, and expenses. Eckert at 34-35.

On July 7, 2005, Grandview LLC entered into a contractual purchase agreement with Madison Funeral Service, the basic terms of which provided that Grandview LLC would put no money down initially, make monthly payments for two years, and then be responsible for the remainder of the purchase price at the end of two years.  The expectation, according to Mr. Mefford, was that he would run the Cemetery for the first two years in the same manner that Mr. Holt had operated it so that if, after that time

period, Mr. Mefford was unable to secure financing to make the balloon payment or the

deal otherwise fell apart, Mr. Holt could easily retake control of the business.  After Mr.

Mefford took over operation, the Cemetery's trust funds remained at the existing bank in

the name of Mr. Holt's entity, Madison Funeral Service.  When Mr. Mefford performed

work at the Cemetery and needed funds out of the trust to pay for that work, he had to

complete documentation and then present it to the trustee, in order to receive the funds.

**Trust Fund Shortages and Drainage Problems at the Cemetery**

By September 2005, Mr. Mefford began to discover problems with the Cemetery's

trust funds, specifically that there were shortages in the funds.  Additionally, the process

of retrieving the trust funds created cash flow problems for Grandview LLC because Mr.

Mefford was unable to easily access the money.  When these problems arose, Mr.

Mefford discussed them with Mr. Eckert.  Mr. Eckert contacted Mr. Holt's attorney by

letter and telephone and requested that the funds in the trust be more easily accessed by

Mr. Mefford so that Grandview LLC could pay for the services it was rendering.  A few

months later, in May 2006, Mr. Mefford discovered problems related to improper

drainage at the Cemetery, resulting in such issues as water accumulating in the graves and

flooded lawn crypts.  Upon this discovery, Mr. Mefford also consulted Mr. Eckert about

the drainage issues.  Mr. Mefford testified that, during this time period, he talked with Mr.

Eckert "on a pretty regular basis, at least once a week."  Mefford at 34.

Mr. Eckert eventually notified Madison Funeral Service by letter that it was in

breach of the outstanding liabilities clause of the contract and that Grandview LLC was going to stop making payments unless and until the breach was remedied.  Eckert at 39-40.  Anticipating that litigation against Madison Funeral Service might become necessary, Mr. Eckert brought in one of his partners at Alcorn, Goering & Sage, Wilmer Goering, to handle any litigation that might arise.  Before Grandview LLC brought an action against Madison Funeral Service, however, on June 14, 2006, Madison Funeral Service sued Grandview LLC, asserting a breach of the purchase agreement by virtue of Grandview LLC's failure to make installment payments of the purchase price.  In response, on June 19, 2006, Mr. Goering filed a lawsuit on behalf of Grandview LLC against Madison Funeral Service, alleging that Madison Funeral Service had itself breached the purchase agreement in several respects.  Mr. Eckert did not enter an appearance in either of these court cases, but Mr. Goering testified that Eckert remained involved in the litigation to the extent that he attended some settlement conferences, kept in contact with Mr. Mefford, and had some input on strategy in the early stages of the litigation.[4]  Goering at 166-67. On March 16, 2007, Mr. Eckert traveled with Mr. Mefford to and from Decatur County, Indiana, for a court hearing related to one of the lawsuits.  According to Mr. Eckert, he

---

[4] Mr. Eckert testified that, once he had referred the litigation matters to Mr. Goering, he felt that he was no longer representing the interests of Grandview LLC and was only representing Mr. Mefford in an individual capacity from that point forward.  Eckert 56. However, the billing statement in the record (the only invoice that Mr. Eckert ever sent to Mr. Mefford), dated March 27, 2007, does not distinguish between work performed for Mr. Mefford personally and work performed on behalf of Grandview LLC, nor did Mr. Eckert ever send a separate invoice to Grandview LLC for his services.  Eckert at 135.  The last entry on the invoice is dated March 16, 2007.  See Exh. 2.

made the trip with Mr. Mefford so that they could discuss Mr. Mefford's future business

strategy with regard to the trust fund and drainage issues.  Mr. Eckert later billed Mr.

Mefford for 3.2 hours of legal work on that day.  Eckert at 55.

**Public Meeting**

After the lawsuits between Grandview LLC and Madison Funeral Service had

been filed, Mr. Mefford continued to consult with Mr. Eckert concerning issues involving

the trust funds and drainage problems at the Cemetery.  They also discussed Mr.

Mefford's business strategy and how best to proceed in light of the discovered problems.

Mr. Mefford testified that he did not want the issues "to be swept under a rug and the

people [who had purchased burial services from the Cemetery] not know what the

problems were.  They needed to be aware of what was going on."  Mefford at 58.  Mr.

Mefford decided that he needed to publicize the issues and elicit public comment and

assistance.  Thus, on July 29, 2006, Mr. Mefford invited the public and the press to a

meeting at the Cemetery.

At that meeting, Mr. Mefford discussed the problems facing the Cemetery,

including the trust fund shortages and the drainage issues.  Mr. Mefford urged the

formation of a public committee to help address these issues and assist with maintenance

of the Cemetery because the trust did not have sufficient funds to pay for such upkeep.

Shortly thereafter, a committee was formed under the name of Volunteers for Grandview

Committee, Inc. ("Grandview Volunteers"), comprised of members of the community,

including some individuals who had purchased burial goods and services at the Cemetery,
who thus had potential claims against Grandview LLC and prior owners of the Cemetery.

**Trust Fund Class Action Lawsuit**

According to Mr. Mefford, his intention in going public with this information and
in helping create the Grandview Volunteers was to help the people who had purchased
goods and services from the Cemetery and who were going to be or had already been
affected by the trust fund shortages and drainage problems.  Because of the extent of the
issues developing at the Cemetery, Mr. Eckert concluded that addressing those problems
would require more than just a local effort.  Thus, at some point in the fall of 2006, Mr.
Eckert contacted the Indianapolis law firm of Cohen & Mallad to discuss the possibility
of filing a class action lawsuit.  On September 27, 2006, Mr. Mefford, his father-in-law,
Mr. Eckert, and Mr. Goering along with Richard Shevitz and Vess Miller, both attorneys
from Cohen & Mallad, met in Mr. Eckert's office for a general discussion covering all
topics related to the Cemetery, including, the breach of contract issues, the problems with
water in the graves, and the shortage of trust funds.

Following the meeting, Mr. Goering, with the help of Mr. Mefford, gathered
information requested by Mr. Shevitz and Mr. Miller, including the pleadings in the
breach of contract lawsuit against Madison Funeral Service, the purchase agreement for
the Cemetery, some of the Cemetery's financial records, and examples of sales contracts.
Goering at 179-80.  Mr. Shevitz and Mr. Miller agreed to research the issues and evaluate

whether there was a claim that could be presented.  Goering at 181.  A follow-up meeting was held on November 2, 2006.  Mr. Goering testified that he is certain that he, Mr. Mefford, Mr. Shevitz, and Mr. Miller all attended that meeting, but is unsure whether Mr. Eckert was present.  According to Mr. Goering, at that meeting Mr. Shevitz and Mr. Miller reported that they believed a claim could be pursued with regard to the shortages in the trust funds, but that any such lawsuit would necessarily include Grandview LLC as well as the previous owners of the Cemetery.  Goering at 182-83.

At a committee meeting on November 8, 2006, members of the Grandview Volunteers discussed retaining Cohen & Mallad as their attorneys for a class action lawsuit regarding the shortages in the Cemetery's trust funds as well as the drainage issues.  Terry Rowlett, President of the Grandview Volunteers, testified that he was aware that Mr. Mefford had met previously with the attorneys from Cohen & Mallad to discuss the problems facing the Cemetery and that, at the November 8th meeting, Mr. Eckert initially introduced the committee to the firm.  According to Mr. Rowlett, it was his understanding at that time that the current and prior owners of the Cemetery would all be named as defendants in any lawsuit related to the trust.  Rowlett at 210-12.  Mr. Eckert testified that he was representing Mr. Mefford when that meeting occurred and that he discussed that fact with the Grandview Volunteers at the meeting.  On April 20, 2007, Cohen & Mallad filed a class action lawsuit pertaining to the shortages in the trust accounts in Marion Circuit/Superior Court, which included Mr. Mefford's entity, Grandview LLC, as a defendant.

**"Of Counsel" Relationship Between Eckert and Goebel**

In February 2006, Mr. Eckert withdrew from the law firm of Alcorn, Goering & Sage to start his own law practice.  Although he was no longer a member of the firm, Mr. Eckert continued to work out of that office acting in an "of counsel" capacity to the firm until October 2006,[5] at which point he moved to his own building in Madison, Indiana, and conducted his practice under the name of Eckert Law Firm.  A few months later, in January 2007, Mr. Eckert discussed with Anthony Goebel the possibility of Goebel's sharing office space with the Eckert Law Firm.  At that time, Mr. Goebel was reentering the practice of law after approximately six years serving as a church pastor.  Mr. Eckert and Mr. Goebel discussed the possibility of becoming affiliated as "of counsel" with each other's firms and, after researching the designation, entered into an of counsel relationship in February 2007.[6]

Both Mr. Eckert and Mr. Goebel testified that they are not associated with one another as a partnership; they merely share office space.  Mr. Goebel's main office is located in Georgetown, Indiana.  Each attorney pays his own employees, maintains his client files separately at his own main law office location, and otherwise operates a

---

[5] Mr. Eckert received a document from Alcorn, Goering & Sage dated November 2, 2006, on which he was still listed as "of counsel" to the firm.  Mr. Eckert testified that he called Mr. Goering immediately after receiving it to request that the letterhead be updated to reflect the fact that he (Eckert) no longer had such a relationship with the firm.  Eckert at 133.  However, Mr. Eckert continued to refer litigation matters to Mr. Goering until the time when he (Eckert) associated himself with Mr. Goebel.  Eckert at 134.

[6] Prior to that date, Mr. Goebel had no affiliation with the Eckert Law Firm or with any client of that firm.

separate law practice.  Mr. Goebel does not have a key to Mr. Eckert's offices and Mr. Eckert's office computers are password protected, preventing Mr. Goebel from being able to access them.  Goebel at 156-57.  Both attorneys testified that they keep all information regarding prior or current clients confidential and do not share those confidences with each other.

**Goebel's Meeting With Grandview Volunteers**

During the week of March 12, 2007, Mr. Eckert and Mr. Goebel had a telephone conversation during which Mr. Eckert asked if Mr. Goebel could meet with the Grandview Volunteers to discuss the problems at the Cemetery.[7]  According to Mr. Goebel, Mr. Eckert stated that he (Eckert) had represented the then-current owner and operator of the Cemetery, Grandview LLC, and/or its principal member, Mr. Mefford, in the past but did not provide details as to the extent or nature of his representation or otherwise discus anything that Mr. Mefford had conveyed to Mr. Eckert.  Goebel at 138-41.  According to Mr. Eckert, he also told Mr. Goebel that he was continuing to represent Mr. Mefford personally.  Eckert at 66.  Following that telephone conversation, Mr. Goebel arranged to meet with the Executive Board of the Grandview Volunteers on March 17, 2007.  Mr. Goebel testified that, at that meeting, he explained his professional

---

[7] Mr. Eckert testified that he called Mr. Goebel because Mr. Mefford had contacted him (Eckert) and asked whether he knew of an attorney who would be willing to handle the drainage issues for the Grandview Volunteers.  Eckert at 60.

11

connection with Mr. Eckert and, though he did not believe there to be a conflict, verbally

sought the committee's waiver of any potential conflict.  Mr. Mefford was not present for

that meeting and was not a part of that waiver.

Mr. Goebel testified that, at the beginning of the meeting, the members of

Grandview Volunteers interviewed him and then, as the meeting progressed, the

committee shared detailed information regarding both the trust fund and the drainage

issues.  According to Mr. Goebel, this was the first he had ever heard of the alleged

problems at the Cemetery.  At the time of this meeting, Cohen & Mallad was already

handling issues relating to the shortages in the trust fund accounts, so Grandview

Volunteers retained Mr. Goebel to handle the water-in-the-graves issue.  Mr. Rowlett

testified that, at the time the committee retained Mr. Goebel, he (Rowlett) was not

informed whether Mr. Eckert was continuing to represent Mr. Mefford on issues related

to the Cemetery.[8]  Rowlett at 225-26.  Following the meeting, on March 21, 2007, Mr.

Goebel visited the Cemetery to gather information and speak with potential witnesses.

Mr. Goebel testified that Mr. Rowlett and Rodney Nay, a local funeral home owner, were

the two individuals from whom he obtained the most information about the drainage

---

[8] Mr. Rowlett testified that Grandview Volunteers had previously been informed by Mr. Eckert and Cohen & Mallad with regard to the lawsuit related to the trust fund shortages that Mr. Eckert had a conflict representing possible plaintiffs in matters concerning the Cemetery because Mr. Eckert had in the past, or was currently, representing Mr. Mefford and/or Grandview LLC, but that there was no update on Mr. Eckert's status at the March 17th meeting.  According to Mr. Rowlett, because of this information and the fact that Mr. Goebel was seen as being affiliated with the Eckert Law Office, the committee discussed a possible conflict with regard to Mr. Goebel's representation, but ultimately decided to waive any conflict.  Mr. Mefford was not a part of this waiver, however.  Rowlett at 238-42.

problems at the Cemetery.

After visiting the Cemetery, Mr. Goebel decided that any lawsuit relating to the drainage issues would have to be a class action and that he would need the assistance of other counsel to litigate such a claim.  Thus, on April 4, 2007, Mr. Goebel contacted the firm where he had formerly been affiliated, Wyatt Tarrant & Combs LLP, and inquired of attorney Stephen Pitt whether he would be interested in becoming involved in the case.  Mr. Pitt agreed to join in representing Plaintiffs.  On that same day, Mr. Goebel and Mr. Pitt discussed an Indiana statute that they believed required the current owner of the Cemetery, to wit, Mr. Mefford's entity, Grandview LLC, to be named as a defendant in any lawsuit they would bring based on the drainage issues.

**The April 13, 2007 Meeting**

On April 13, 2007, Mr. Eckert set up a meeting at his office with Mr. Mefford, Mr. Goebel, Mr. Pitt, Mr. Nay, and Mr. Rowlett.  Mr. Goebel and Mr. Pitt arrived together and spoke briefly with Mr. Eckert before the others arrived.  There is some dispute regarding the extent of Mr. Eckert's participation in that meeting, but the parties agree that Mr. Eckert was initially present, made introductions, and then, at some point early in the meeting, left the room.  Mr. Goebel testified that he then explained his relationship with the Eckert Law Firm.  According to Mr. Goebel, he stated that he was "of counsel, not a partner, not an associate, not an employee of the firm," and that he represented the Grandview Volunteers and would be handling their case.  Goebel at 138.  Mr. Goebel

13

further testified that he remembered Mr. Mefford being there at that time.[9]  However, Mr. Goebel never requested or otherwise obtained from Mr. Mefford a written waiver of any potential conflict.

There is also some dispute between the parties regarding the topics discussed at the meeting.  Mr. Mefford testified that he viewed the meeting as "a fact finding, bring up to speed, general discussion of what was going on at Grandview," (Mefford at 62), and that both the drainage issues and the trust fund matters were discussed.  Mr. Goebel, however, testified that the bulk of the time was used to discuss the prior ownership of the Cemetery back to its organization in 1978.  According to Mr. Goebel, although there was some discussion of the trust shortages and the drainage problems, he learned nothing more about those issues than what he had already learned from the Grandview Volunteers.

Mr. Mefford testified that the possibility that his entity, Grandview LLC, would be named as a defendant in a lawsuit pertaining to the drainage issues at the Cemetery was brought up at the meeting but that Mr. Eckert dismissed the idea.[10]  According to Mr.

---

[9] Mr. Nay, who was also at the meeting, testified that he does not remember whether Mr. Mefford was present at the time when Mr. Goebel explained his relationship with the Eckert Law Firm. However, he stated that he does remember that the explanation was given at the beginning of the meeting and at one point, early in the meeting, Mr. Mefford stepped out of the room to speak with Mr. Eckert.  Nay at 13-14.  Mr. Rowlett testified that, to the best of his knowledge, Mr. Mefford was present at the time Mr. Goebel explained that he (Goebel) had office space at the Eckert Law Office and was of counsel to the firm.  Rowlett at 217-18.

[10] Mr. Eckert testified that, beyond the initial introductions, he was not a part of this meeting, and thus, would not have been present for this discussion.  However, according to Mr. Eckert, he had already discussed with Mr. Mefford the possibility that Grandview LLC would be named as a defendant on March 16, 2007, when the two traveled together to the hearing related

(continued...)

14

Mefford, although he "never felt that Mr. Goebel was going to represent [him]," (Mefford

at 68), he "certainly did not feel that Mr. Goebel was there to say I'm going to sue you."

Id.  Rather, Mr. Mefford testified that he viewed his involvement as follows: "I was to

help the people get what they deserved and I felt like that was the right thing to do.  I was

cooperating with my attorney [Eckert] to make that happen."  Id. at 66.  Mr. Goebel,

however, testified that he explained to Mr. Mefford that it was likely that Grandview LLC

would need to be named as a defendant in any potential lawsuit and, although Mr.

Mefford, Mr. Nay, and Mr. Rowlett questioned whether that would be necessary, Mr.

Goebel assured them that it was.[11]  According to Mr. Goebel, Mr. Mefford stated that he

(Mefford) understood that his LLC would have to be named and that, as the

whistleblower, he just wanted to make it right.  Goebel at 166-67.

There was also a discussion during the meeting about Grandview LLC's insurance

policy.  Upon request, Mr. Mefford provided a copy of the policy to Mr. Goebel and Mr.

---

[10](...continued)
to the litigation between Grandview LLC and Madison Funeral Service.  Mr. Eckert further
testified that he had warned Mr. Mefford even at the time Grandview LLC was formed that there
were certain situations in which a purchaser could be held accountable for problems caused by
the prior owner(s).  Eckert at 118.

[11] Mr. Nay testified that he does not recall a discussion about the possibility that
Grandview LLC would need to be named as a defendant and that, when the action was filed, Mr.
Mefford called him "shocked that that group of [plaintiffs] was suing him."  Nay at 14-15.  Mr.
Rowlett testified that there was a discussion regarding which entities would be named as
defendants at the meeting and that it was clear that both the current owner, Grandview LLC, as
well as the prior owners would have to be named.  Mr. Rowlett also testified that he remembered
Mr. Mefford being in the room when that discussion was held and that Mr. Mefford was not
surprised when Grandview LLC was named in this lawsuit.  Rowlett at 217, 221.

Pitt.  There is a dispute between the parties regarding the context in which the discussion

about the insurance policy arose.  Plaintiffs contend that Mr. Mefford provided a copy of

the insurance policy in response to being told that Grandview LLC would have to be

named as a defendant in any lawsuit related to the drainage issues at the Cemetery.

However, Defendants contend that Mr. Mefford gave Mr. Goebel and Mr. Pitt a copy of

the policy so that they could review it for fire loss coverage issues.  A few weeks before

the April 13th meeting, there had been a fire at the Cemetery and many files and records

had water and/or smoke damage.  Mr. Mefford was in the process of copying all of the

documents in order to preserve them, but was having difficulty doing so, and thus,

Defendants contend that Mr. Goebel and Mr. Pitt offered to review the policy to

determine whether Mr. Mefford could receive any funds to help him complete the

process.[12]  Following the meeting, Mr. Pitt sent a letter to Mr. Mefford dated April 16,

2007, indicating that Mr. Goebel, Mr. Pitt, and Mr. Eckert would review the insurance

documents, discuss the situation more fully, and then be back in touch.  See Pl.'s Exh. 6.


**The Instant Suit and Subsequent Motions to Disqualify**

On August 17, 2007, Mr. Goebel filed the instant lawsuit, initially in Jefferson

Circuit Court.  The first page of the Complaint states that Plaintiffs filed the lawsuit "on

behalf of themselves and all others similarly situated, by counsel, John C. Eckert and J.

---

[12] Mr. Rowlett testified that he remembered the insurance policy being discussed with
reference to the fire at the Cemetery and the need to preserve documents.  Rowlett at 219.

Anthony Goebel of the Eckert Law Firm."  Only one signature block appears on the

Complaint.  Mr. Goebel signed the document and the text beneath Mr. Goebel's

signature, reads: "John C. Eckert, Attorney," followed by Mr. Eckert's bar number, and

"J. Anthony Goebel, Attorney," with the words "Eckert Law Office" underneath and the

entity's address listed as "606 E. Main Street, Madison, Indiana, 47250."  In addition to

this cause of action, Mr. Goebel filed additional lawsuits concerning the Cemetery in

Jefferson Circuit Court and the signature block on each of those complaints is in the same

form.  Mr. Goebel testified that it was his practice when filing in Jefferson Circuit Court

to use the Eckert Law Firm signature block on any matter filed in Madison, Indiana,

where the offices of the Eckert Law Firm are located and use the signature block

identifying the Goebel Law Office when filing elsewhere.

Although Mr. Goebel filed the Complaint in the case at bar, Mr. Eckert was also an

attorney of record in the case from the time it was filed in August 2007 until he withdrew

his appearance in October 2008.  Mr. Pitt and Merrill Schell, both from Wyatt Tarrant &

Combs LLP, entered their appearances on behalf of Plaintiffs on January 3, 2008, after

the case had been removed from state to federal court on October 15, 2007.  Mr. Goebel

testified that, once the case was removed, he believed that Mr. Eckert was no longer an

attorney of record because Mr. Goebel had been told by the clerk's office to reenter his

appearance at that time and Mr. Eckert did not reenter an appearance for himself.  Goebel

at 146.  According to Mr. Goebel, it was simply an oversight that Mr. Eckert's name

remained listed as an attorney of record after the case was removed.[13]  At a Grandview
Volunteers meeting held on December 7, 2007, Mr. Rowlett asked Mr. Goebel to have
Mr. Eckert remove himself as counsel for Plaintiffs, so it appears, at least as of that date,
that Mr. Goebel was aware that Mr. Eckert was still involved with the case in some
capacity.  Rowlett at 245-47.  However, Mr. Eckert did not withdraw at that time.

Although Mr. Eckert remained named as an attorney of record, Mr. Goebel
testified that he (Goebel) drafted the Complaint without input from Mr. Eckert and that
Mr. Eckert did not work on the case at all after October 2007, when the conflict issue was
initially raised on behalf of Grandview LLC by Richard Mullineaux, of the law firm of
Kightlinger & Gray LLP, who was representing the LLC.  On October 8, 2007, Mr.
Mullineaux met with Mr. Mefford and two other members of Grandview LLC and
learned of Mr. Eckert's representation of Mr. Mefford and the LLC.  According to Mr.
Mullineaux, on October 12, 2007, he contacted Mr. Eckert by telephone and told Mr.
Eckert that he (Eckert) should consider taking one of two options: either the Eckert Law
Firm could withdraw its representation of Plaintiffs or it could dismiss Grandview LLC
from the litigation and obviate the conflict.  Mullineaux at 141.  Neither action was taken
by Plaintiffs' counsel at that time.

On October 22, 2007, Mr. Mullineaux met with Mr. Goebel, Mr. Pitt, and Mr.

_____

[13] In his testimony, Mr. Eckert acknowledged that, once the case was removed to federal
court, he was regularly receiving e-mails alerting him of each filing in the case, but that he did
not read through those e-mails.  However, he testified that, at least as of November or December
of 2007, he was aware that he was still listed as an attorney of record in this case.  Eckert at 70-
74.

Schell to discuss the potential conflict issue.[14]  Mr. Eckert testified that, during that

meeting, he stated that he did not believe that there was a conflict of interest and that he

would not be withdrawing his representation because Mr. Mefford wanted him to

continue to be a part of the case.  Eckert at 75.  Mr. Goebel and Mr. Eckert both testified

that, at the October 22nd meeting, there was only discussion about a possible conflict

with regard to Mr. Eckert, not Mr. Goebel or any of the attorneys from Wyatt Tarrant &

Combs.  However, Mr. Mullineaux testified that he referred to all of the attorneys then

representing Plaintiffs.  Mullineaux at 147-48.  On October 30, 2007, Mr. Mullineux

followed up with Mr. Goebel via telephone and Mr. Goebel confirmed that none of

Plaintiffs' attorneys would be withdrawing from the case and that Grandview LLC would

not be dismissed from the litigation.  The next day, Mr. Mullineaux informed his co-

counsel, Jeffrey Hawkins, of the substance of his conversation with Mr. Goebel.  Counsel

for Grandview LLC took no further action with regard to the potential conflict issues at

that point.

One year later, in October 2008, Mr. Goering contacted Mr. Eckert and stated that,

while Mr. Mefford did not object to Mr. Eckert remaining as an attorney of record in the

case, Mr. Mefford was receiving a lot of pressure from others, specifically, Mr. Hawkins,

regarding Mr. Eckert's participation, and therefore requested that Mr. Eckert withdraw his

---

[14] Approximately a week before this meeting occurred, on October 15, 2007, Grandview
LLC removed the case to federal court.  Mr. Mullineaux testified that there was some discussion
at the October 22nd meeting about the possibility of either withdrawing the removal or
stipulating to remand the case if Plaintiffs agreed to dismiss Grandview LLC from the litigation
and the other defendants did not object to the remand.  Mullineaux at 148.

representation of Plaintiffs.  Eckert at 74; Goering at 189-90.  Mr. Goering did not indicate to Mr. Eckert that any issue had been raised regarding the representation by Mr. Goebel or any of the attorneys from Wyatt Tarrant & Combs.  Goering at 190-91.  On October 2, 2008, Mr. Eckert filed a motion to withdraw, which this Court granted on October 7, 2008.  Up to that time, Defendants had not filed a motion to disqualify Mr. Goebel or any of the attorneys from Wyatt Tarrant & Combs.

According to Plaintiffs' counsel, not until April 15, 2009, was the conflict issue raised in reference to Mr. Goebel and Wyatt Tarrant & Combs.  On that date, Mr. Goebel spoke by telephone with two attorneys representing Grandview LLC in this matter, Peter Tamulonis and Mr. Hawkins, both with Kightlinger & Gray.  On April 22 and 24, 2009, respectively, Mr. Simpson and Grandview LLC filed the motions to disqualify currently before the Court.[15]  However, as of the time of the Court's convening to consider these matters, no motions to disqualify had been filed by Defendants' attorneys in any of the other cases filed in state court related to the Cemetery in which Plaintiffs' counsel are also attorneys of record.[16]

---

[15] Mr. Mullineaux and Mr. Goering both testified that they did not relay any information regarding the possible conflict to John Carroll, counsel for Mr. Simpson.  Accordingly, Mr. Simpson contends that he did not learn the full extent of the conflict until April 8, 2009, when Plaintiffs deposed Mr. Mefford.

[16] At the time the hearing to address these matters was held, Mr. Eckert was still counsel of record in all the state cases related to the Cemetery and there had never been a motion to disqualify him filed in those cases either.

**Legal Analysis**

## I.    Standard of Review

The standards governing disqualification of an attorney derive from two sources:

Indiana's Rules of Professional Conduct and federal common law.  The Rules of

Professional Conduct as promulgated by the Indiana Supreme Court have been adopted as

standards of conduct for practice in this Court.  See Gen-Cor, LLC v. Buckeye

Corrugated, Inc., 111 F. Supp. 2d 1049, 1051-52 (S.D. Ind. 2000) (Barker, C.J.) (citations

omitted).  Rule 1.9 of the Indiana Rules of Professional Conduct provides in relevant part

that:

> A lawyer who has formerly represented a client in a matter shall not
> thereafter represent another person in the same or a substantially related
> matter in which that person's interests are materially adverse to the interests
> of the former client unless the former client gives informed consent,
> confirmed in writing.

Rule 1.9(a).[17]  Rule 1.10 provides in relevant part: "While lawyers are associated in a

firm, none of them shall knowingly represent a client when any one of them practicing

alone would be prohibited from doing so by Rules 1.7, 1.9, or 2.2 . . . ."  Rule 1.10(a).

---

[17] When the client in question is a current client, Rule 1.7 applies, which provides that, except in certain circumstances which are inapplicable here, "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest.  A concurrent conflict of interest exists if: (1) the representation of one client will be directly adverse to another client; or (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer."  Rule 1.7(a).  Although certain evidence presented at the hearing at the very least raises questions regarding whether Mr. Eckert ever stopped representing Mr. Mefford and/or Grandview LLC, we apply the less stringent test applicable to former clients for purposes of this ruling.

Federal common law independently supplies standards for disqualification.[18]  See

LaSalle Nat'l Bank v. Lake County, 703 F.2d 252, 255 (7th Cir. 1983); Analytica, Inc. v.

NPD Research, Inc., 708 F.2d 1263, 1266-67 (7th Cir. 1983).  In our court, the standard

for determining whether a conflict of interest exists to justify disqualification of an

attorney is governed by the "substantial relationship" test developed by the Seventh

Circuit, and based on the American Bar Association ("ABA") Code of Professional

Responsibility Canons 4 and 9.[19]  Emmis Operating Co. v. CBS Radio, Inc., 480 F. Supp.

2d 1111, 1118 (S.D. Ind. 2007) (McKinney, C.J.) (citing LaSalle Nat'l Bank, 703 F.2d at

255).  Under that test, the Court must determine "whether it could reasonably be said that

during the former representation the attorney might have acquired information related to

the subject matter of the subsequent representation."  703 F.2d at 255 (citations omitted).

This inquiry requires the Court to engage in the following three-step analysis: (1) a

factual reconstruction of the scope of the prior legal representation or consultation; (2) a

determination as to whether it is reasonable to infer that confidential information would

have been given to a lawyer representing a client in those matters; and (3) a determination

of whether such information is relevant to the issues raised in the pending adverse

---

[18] When federal law and the local rules diverge, it is not always entirely clear which should govern the issue of attorney disqualification.  Fortunately, however, there does not appear to be a significant divergence in this case between the relevant Rules of Professional Conduct and the disqualification standards set forth by the Seventh Circuit and the Supreme Court governing the issues at bar.

[19] ABA Canons 4 and 9 protect the same interests as Indiana Professional Rule of Conduct 1.9.

litigation.  Id. at 255-56.  If the Court determines that a substantial relationship exists, it may "presume that the attorney received confidential information during his prior representation."  Id. at 256.  In other words, once a substantial relationship has been shown, "it is unnecessary for the movant to prove that the attorney in question actually received during the course of his former employment confidential information relevant to matters involved in the subsequent representation."  Id. at 255 (citing Schloetter v. Railoc of Ind., Inc., 546 F.2d 706, 710 (7th Cir. 1976)).

Under certain circumstances, this presumption is rebuttable "by clear and effective evidence that the attorney in question had no knowledge of the information, confidences and/or secrets related by the client in the prior representation."  Emmis, 480 F. Supp. 2d at 1118 (citing LaSalle, 703 F.2d at 256).  For example, in the case where a member or associate of a law firm changes jobs and later, he or his new firm is retained by an adversary of a client of his former firm, the lawyer can rebut the presumption "by showing that effective measures were taken to prevent confidences from being received by whichever lawyers in the new firm are handling the new matter."  Analytica, 708 F.2d at 1267 (citations omitted).  However, in the case where a substantial relationship exists and either an entire firm or an individual attorney himself switches sides and represents a new client against a former client, the presumption that confidential information was passed during the first representation is irrebuttable and the attorney or firm cannot avoid disqualification.  See id. at 1266-67.

## II.      Disqualification

In order to determine whether a substantial relationship exists, we first undertake a factual reconstruction of Mr. Eckert's original representation of Mr. Mefford and Grandview LLC.  Plaintiffs contend that Mr. Mefford came to Mr. Eckert in May 2005 with a virtually completed purchase agreement for the Cemetery and that the extent of Mr. Eckert's representation on that matter was to advise Mr. Mefford to form an LLC to make the purchase and assist Mr. Mefford in filing the proper documents to set up that LLC.  Although Mr. Eckert continued to advise Mr. Mefford following the purchase of the Cemetery regarding the trust issues and the water in the graves, Plaintiffs claim that Mr. Eckert was acting solely for Mr. Mefford in a personal capacity and was providing advice on public relations and business strategy as opposed to legal advice.  According to Plaintiffs, Mr. Eckert learned no more about the issues relevant to this litigation from Mr. Mefford than the general public was able to acquire merely by reading the newspaper. Thus, Plaintiffs contend that it would be "counterintuitive" to consider that Mr. Eckert was actually representing Grandview LLC "in 2006 and beyond."  Pl.'s Resp. at 12.

We consider the evidence adduced at the hearing to establish otherwise.  Upon review of the proposed contract at the behest of Mr. Mefford, Mr. Eckert engaged in negotiations on behalf of Grandview LLC by adding provisions to the purchase agreement relating to outstanding liabilities and indemnification.  It is undisputed that, when Mr. Mefford discovered the problems relating to the trust funds and the drainage issues which are the subject of this litigation, he provided that information to Mr. Eckert

24

and consulted him regarding various strategies for addressing the problems.  As

Defendants point out, Mr. Eckert obviously was representing Grandview LLC when he

contacted Mr. Holt's counsel in the fall of 2005 and requested that Madison Funeral

Service allow funds to be paid out of the trusts for the LLC's use.  He was also

representing the LLC when he informed Mr. Holt's counsel in the spring of 2006 that

Madison Funeral Service was in breach of the purchase contract, based in part on the

water in the graves, and that the LLC would cease its monthly payments until the breach

was remedied.  Moreover, there is no way to separate Mr. Eckert's representation of Mr.

Mefford as an individual from Mr. Eckert's representation of Grandview LLC.  Mr.

Mefford's interests were obviously intertwined with those of Grandview LLC's, and Mr.

Eckert never differentiated between work he performed for Grandview LLC and work he

performed for Mr. Mefford in his billing records and invoices.  The invoice made a part

of the record at the hearing shows that Mr. Eckert continued to bill Mr. Mefford and/or

Grandview LLC for his services through March 16, 2007.[20]

It is more than reasonable to infer, by virtue of that representation, that Mr. Eckert

would have (and did) receive confidential information about Grandview LLC, including

details about its financial situation and operating procedures, as well as specific

information about the drainage and water-in-the-graves problems at issue in the instant

---

[20] One month later, on April 17, 2007, Mr. Eckert's name was listed as an attorney of
record for Plaintiffs on the Complaint filed in this matter, which includes Grandview LLC as a
defendant.  It was not until October 2, 2008, when he was directly asked to withdraw his
representation of Plaintiffs by his former law partner, Mr. Goering, acting at the behest of Mr.
Mefford, that Eckert finally and officially did so.

litigation.  Such information would clearly be germane to the issues in dispute.  The two

matters were substantially related and thus it is presumed that confidences were shared.

Because Mr. Eckert himself switched sides when he became an attorney of record for

Plaintiffs in this matter against Grandview LLC, after having represented the LLC in a

substantially related matter, the presumption that he actually received confidential

information during his representation of the LLC is irrebuttable, and thus, he is prohibited

from representing Plaintiffs in the instant litigation against the LLC.  See Analytica, 708

F.2d at 1266-67.  We view this conclusion as virtually beyond doubt.

 Whether Mr. Eckert's conflict extends to and encompasses Mr. Goebel's

representation of Plaintiffs is a closer question.  Plaintiffs contend that the irrebuttable

presumption of shared confidences does not extend to Mr. Goebel because he and Mr.

Eckert were not members of the same firm, but rather acted merely as of counsel to one

another's firms.  According to Plaintiffs, "of counsel" status is "too attenuated for

application of an irrebuttable presumption."  Pl.'s Resp. at 13.  Defendants rejoin that

because Mr. Goebel and Mr. Eckert held themselves out to the public and to the courts as

both being affiliated with the Eckert Law Firm, the irrebuttable presumption of shared

confidences applies.  Alternatively, Defendants contend that Mr. Eckert and Mr. Goebel

together constituted a firm under the Indiana Rules of Professional Conduct, and thus, Mr.

Goebel was and is prohibited from representing Plaintiffs under Rule 1.10.  We are

persuaded by Defendants' contention and evidence that Mr. Eckert and Mr. Goebel did, in

fact, hold themselves out jointly and severally as a firm.  Accordingly, the irrebuttable

presumption of shared confidences applies to Mr. Goebel, disqualifying him from

representing Plaintiffs under both the federal common law analysis set forth in <u>Analytica</u>

and Rule 1.10 of the Indiana Rules of Professional Conduct.

Comment 2 to Rule 1.0 of the Indiana Rules of Professional Conduct addresses the

situation of when two or more attorneys constitute a firm.  Comment 2 provides in

relevant part as follows:

> Whether two or more lawyers constitute a firm . . . can depend on the
> specific facts.  For example, two practitioners who share office space and
> occasionally consult or assist each other ordinarily would not be regarded as
> constituting a firm.  *However, if they present themselves to the public in a
> way that suggests that they are a firm or conduct themselves as a firm, they
> should be regarded as a firm for purposes of the Rules*. . . .

Cmt. 2 to Rule 1.0 (emphasis added).

Here, Mr. Eckert and Mr. Goebel for no brief period of time clearly presented

themselves as a firm, not only to the public, but to the courts as well.  As discussed above,

the Complaint discloses that Plaintiffs filed the lawsuit "on behalf of themselves and all

others similarly situated, by counsel, John C. Eckert and J. Anthony Goebel, of the Eckert

Law Firm."  Only one signature block appears on the Complaint, but, under Mr. Goebel's

signature, the text states as follows: "John C. Eckert, Attorney," followed by Mr. Eckert's

bar number, and "J. Anthony Goebel, Attorney," with the words "Eckert Law Office"

underneath and the address of the Eckert Law Firm in Madison, Indiana.  In the

contingent fee agreement which Mr. Goebel testified that he drafted, he represented both

himself and Mr. Eckert as attorneys of the Eckert Law Firm.  In light of these

representations, we find that Mr. Goebel must be regarded as part of the Eckert Law Firm for purposes of the disqualification analysis.[21]  Accordingly, because Mr. Eckert is prohibited from representing Plaintiffs, Mr. Goebel is similarly prohibited pursuant to Rule 1.10 of the Indiana Rules of Professional Conduct.

Mr. Goebel is also subject to disqualification under the federal common law standards set forth by the Seventh Circuit court in Analytica.  Having found that Mr. Eckert's entire law firm switched from first representing Grandview LLC to representing Plaintiffs against the LLC in a substantially related matter, and that Mr. Goebel must be considered part of that firm for purposes of this disqualification analysis, the exception noted above where the law firm itself does not switch sides is inapplicable.  Thus, the presumption that confidential information was shared between Mr. Eckert and Mr. Mefford and between Mr. Eckert and Mr. Goebel is irrebuttable, and "it is not appropriate

---

[21] Even if Mr. Eckert and Mr. Goebel had not held themselves out as a firm, there is some indication that Mr. Goebel would nonetheless be subject to disqualification based solely on his of counsel relationship with the Eckert Law Firm.  The ABA specifically addressed the issue of disqualification with reference to attorneys in an of counsel relationship in its Formal Opinion 90-357, which provides in relevant part as follows:

> [T]he relationship clearly means that the lawyer is "associated" with each firm with which the lawyer is of counsel.  In consequence there is attribution to the lawyer who is of counsel of all the disqualifications of each firm. . . . There can be no doubt: that an of counsel lawyer . . . is "associated in" and has an "association with" the firm . . . to which the lawyer is of counsel, for purposes of . . . the general imputation of disqualification pursuant to Rule 1.10 of the Model Rules. . . . Similarly, the of counsel lawyer is "affiliated with" the firm and its individual lawyers for purposes of general attribution of disqualifications DR5-105(D) of the Model Code.

ABA Formal Opinions, 901 at 130-31.

28

for the court to inquire into whether actual confidences were disclosed." Analytica, 708 F.2d at 1267 (quoting Westinghouse Elec. Corp. v. Gulf Oil Corp., 588 F.2d 221, 224 (7th Cir. 1978)).  Accordingly, it is irrelevant whether Mr. Eckert and Mr. Goebel maintained a "Chinese wall" to ensure that information was not shared between them.  Id. at 1267-68.  Therefore, the representations of Plaintiffs' counsel that Mr. Eckert and Mr. Goebel never discussed the drainage issues at the Cemetery or any other confidential information related to Mr. Eckert's representation of Mr. Mefford and Grandview LLC and that they maintained various safeguards, such as storing their files in separate locations to which the other did not have access, do not affect our analysis.

The Wyatt firm is also disqualified from representing Plaintiffs in this matter by virtue of their status as co-counsel to Mr. Eckert (the Wyatt attorneys filed their appearances while Mr. Eckert was still listed as an attorney of record in this litigation) and Mr. Goebel.  Even if the Wyatt firm were determined as a factual matter to be completely innocent lacking any knowledge of Mr. Eckert's prior representation of Mr. Mefford and Grandview LLC, as co-counsel, the Wyatt attorneys clearly had access, actual or potential, to whatever confidential information Mr. Eckert and, by extension, Mr. Goebel, obtained while representing Grandview LLC.  Accordingly, the Wyatt firm is also disqualified.  See Analytica, 708 F.2d at 1266 (observing that a firm that did not even know about the prior representation was disqualified simply because it acted as co-counsel to the prohibited firm).

### III.   Waiver

Plaintiffs' counsel contends that, even if Grandview LLC's motion to disqualify is deemed meritorious, by failing to raise the issue within a reasonable amount of time after discovering the facts supporting their motions, Grandview LLC has waived its right to challenge any conflict.  It is well-established under Seventh Circuit law that: "A motion to disqualify should be made with reasonable promptness after a party discovers the facts which lead to the motion."  Kafka v. Truck Ins. Exchange, 19 F.3d 383, 386 (7th Cir. 1994) (quoting Central Milk Producers Co-op v. Sentry Food Stores, 573 F.2d 988, 992 (8th Cir. 1978)).  Plaintiffs' counsel contends that Grandview LLC's nearly twenty-month delay in filing the instant motions "strongly suggests that the motion[] [is] no more than the 'tactical use of [a] disqualification motion[] to harass opposing counsel.'" Pl.'s Resp. at 5 (quoting Chem. Waste Mgmt., Inc. v. Sims, 875 F. Supp. 501, 504 (N.D. Ill. 1995)).

There is clear evidence to suggest that Grandview LLC's motion to disqualify may have been filed primarily as a litigation tactic, as opposed to having been motivated by serious concern over the conflict of interest issues.  The instant action was originally filed on August 17, 2007.  Grandview LLC's counsel admit to being on notice as of at least October 12, 2007, that Mr. Eckert had previously represented Mr. Mefford in some capacity, although they contend that they did not become aware of the full extent of Mr. Eckert's representation until much later.  Despite its counsel's knowledge, the LLC did not file its motion to disqualify until April 24, 2009.  Moreover, throughout that time period, Defendants allowed Plaintiffs' counsel, the same counsel they now seek to have

30

disqualified, to take six depositions from February through April 2009, including the deposition of Mr. Mefford himself, without objection.[22]

That said, given the extent of the conflict here, we cannot withhold the remedy of disqualification where the confidence of the public and the integrity of the legal system is at stake.[23]  As the Seventh Circuit observed in <u>Analytica</u>: "For a law firm to represent one client today, and the client's adversary tomorrow in a closely related matter, creates an unsavory appearance of conflict of interest that is difficult to dispel in the eyes of the lay public – or for that matter the bench and bar – by the filing of affidavits, difficult to verify objectively, denying that improper communication has taken place or will take place between the lawyers in the firm handling the two sides."  708 F.2d at 1269.  Any such appearance is particularly difficult to dispel where, as here, the public has been so intimately involved in the progression of this case.  Clients have a right to expect representation that is untainted by conflict and clients will not repose confidences in attorneys or firms who switch from one side to another, whatever the reason.

_____

[22] Additionally, although Mr. Eckert himself, along with Mr. Goebel, filed other actions against Grandview LLC relating to the Cemetery, at the time the hearings in this matter were held, Defendants' counsel had not filed motions to disqualify the same Plaintiffs' counsel in any of those causes of action.  Now, in its post-hearing reply brief on the instant motion, Grandview LLC's attorneys request that we disqualify Mr. Eckert, Mr. Goebel, and the Wyatt firm from any other litigation related to the Cemetery in which they are currently named as attorneys of record.  We decline to take such action; our ruling applies solely to the cause of action before us.

[23] Although Plaintiffs' counsel have obviously dedicated a large number of hours to this matter, the prejudice to Plaintiffs is not as great as it may at first appear because the majority of the parties' efforts since this case was filed have involved Plaintiffs' attempt to persuade the Court to remand the action to state court and discovery related to the remand and class certification issues.

Mr. Mefford's claim that he wanted to do right in the situation in which he found himself and help remedy the many and varied problems he discovered at the Cemetery, prompted him to entrust to Mr. Eckert not only his personal interests, but the interests of his business entity as well.  It is likely that no one initially anticipated that Grandview LLC would end up in an adversarial position to Plaintiffs.  However, the lines of communication and responsibility clearly became tangled early on as the nature of the interests among the various parties began to shift.  We cannot say based on the evidence before us that any one of Plaintiffs' counsel acted in bad faith, but their presumed good faith does not erase or reduce the conflict of interest inherent in this situation.  After placing his trust in Mr. Eckert as his attorney and counsel, Mr. Mefford had a right not to find the name of Mr. Eckert's law firm on a complaint naming his business, Grandview LLC, as a defendant in a matter about which Mr. Mefford had consulted Mr. Eckert.  Similarly, Plaintiffs had a right to know that they were placing their confidences in attorneys who were singularly faithful to their best interests.  For the foregoing reasons, we hold that the remedy of disqualification of all Plaintiffs' counsel, prior and present, is the only solution under the circumstances.

## IV.    Conclusion

For the reasons detailed in this entry, we <u>GRANT</u> Defendant Grandview LLC's motion to disqualify Mr. Goebel and the Law Firm of Wyatt Tarrant & Combs.  Mr. Eckert is also hereby disqualified from any further involvement in this litigation.

32

Plaintiffs shall have sixty (60) days from the date of this Order to secure new counsel and have their appearances filed in this cause.  All motions currently pending are hereby dismissed without prejudice with permission to refile, if necessary, upon Plaintiffs' retention of new counsel.  Each party shall bear its own costs.

IT IS SO ORDERED.

Date: _____ 03/31/2010 _____

_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Robert Lewis Barlow II
BARLOW LAW OFFICE
rbarlow@blueriver.net

Jean W. Bird
WYATT TARRANT & COMBS LLP
jbird@wyattfirm.com

John Francis Carroll
GWIN STEINMETZ MILLER & BAIRD, PLLC
jcarroll@gsmblaw.com

John B. Drummy
KIGHTLINGER & GRAY
jdrummy@k-glaw.com

G. Karl Fanter
BAKER & HOSTETLER LLP
kfanter@bakerlaw.com

J. Anthony Goebel
GOEBEL LAW OFFICE
tony@goebellawoffice.com

Jeffrey D. Hawkins
KIGHTLINGER & GRAY
jhawkins@k-glaw.com

Pamela J. Hensler
MALLOR CLENDENING GRODNER & BOHRER LLP
phensler@mcgb.com

Scott Christopher Holbrook
BAKER & HOSTETLER LLP
sholbrook@bakerlaw.com

Lonnie D. Johnson
MALLOR CLENDENING GRODNER & BOHRER
ljohnson@mcgb.com

Richard T. Mullineaux
KIGHTLINGER & GRAY, LLP
rmullineaux@k-glaw.com

William H. Mullis
whm@mullislaw.com

Ronald Shig Okada
BAKER & HOSTETLER LLP
rokada@bakerlaw.com

M. Stephen Pitt
WYATT TARRANT & COMBS LLP
mspitt@wyattfirm.com

James W. Riley Jr.
RILEY BENNETT & EGLOFF LLP
jriley@rbelaw.com

Merrill S. Schell
WYATT TARRANT & COMBS
mschell@wyattfirm.com

Peter G. Tamulonis
KIGHTLINGER & GRAY
ptamulonis@k-glaw.com

Michael  Wroblewski
KIGHTLINGER & GRAY
mwroblewski@k-glaw.com